# APTHEKER ET AL. *v.* SECRETARY OF STATE.

No. 461.  Argued April 21, 1964.—Decided June 22, 1964.

*John J. Abt* and *Joseph Forer* argued the cause and filed briefs for appellants.

*Abram Chayes* argued the cause for appellee. With him on the brief were *Solicitor General Cox, Assistant Attorney General Yeagley, Bruce J. Terris, Kevin T. Maroney, Lee B. Anderson* and *Thomas Ehrlich.*

*Osmond K. Fraenkel* filed a brief for the American Civil Liberties Union, as *amicus curiae,* urging. reversal.

MR. JUSTICE GOLDBERG delivered the opinion of the Court.

This appeal involves a single question: the constitutionality of § 6 of the Subversive Activities Control Act of 1950, 64 Stat. 993, 50 U. S. C. § 785. Section 6 provides in pertinent part that:

> "(a) When a Communist organization[1] . . . is registered, or there is in effect a final order of the Board requiring such organization to register, it shall

---

[1] Paragraph 5 of § 3 of the Act provides that: "For the purposes of this subchapter . . . [t]he term 'Communist organization' means any Communist-action organization, Communist-front organization, or Communist-infiltrated organization." 64 Stat. 990, as amended, 68 Stat. 777, 50 U. S. C. § 782.

be unlawful for any member of such organization, with knowledge or notice that such organization is so registered or that such order has become final—

"(1) to make application for a passport, or the renewal of a passport, to be issued or renewed by or under the authority of the United States; or

"(2) to use or attempt to use any such passport." [2]

Section 6 became effective, with respect to appellants, on October 20, 1961, when a final order of the Subversive Activities Control Board issued directing the Communist Party of the United States to register under § 7 of the Subversive Activities Control Act. The registration order had been upheld earlier in 1961 by this Court's decision in *Communist Party of the United States* v. *Subversive Activities Control Board,* 367 U. S. 1. Prior to issuance of the final registration order both appellants, who are native-born citizens and residents of the United States, had held valid passports. Subsequently, on January 22, 1962, the Acting Director of the Passport Office notified appellants that their passports were revoked because the Department of State believed that their use of the passports would violate § 6. Appellants were also

---

[2] Section 6 (b) provides that:

"When an organization is registered, or there is in effect a final order of the Board requiring an organization to register, as a Communist-action organization, it shall be unlawful for any officer or employee of the United States to issue a passport to, or renew the passport of, any individual knowing or having reason to believe that such individual is a member of such organization."

The criminal penalties for violations of § 6 are specified in § 15 (c) of the Act which provides in pertinent part that:

"Any individual who violates any provision of section 5, 6, or 10 of this title shall, upon conviction thereof, be punished for each such violation by a fine of not more than $10,000 or by imprisonment for not more than five years, or by both such fine and imprisonment." 64 Stat. 1003, 50 U. S. C. § 794 (c).

notified of their right to seek administrative review of the revocations under Department of State regulations.

Appellants requested and received hearings to review the revocations of their passports. The respective hearing examiners concluded that "the Department of State had reason to believe that [appellants are] within the purview of Section 6 (a)(2) of the Subversive Activities Control Act . . . and as a result thereof . , . use of a passport would be in violation of the law." On the basis of this conclusion the examiners recommended that the passport revocations be sustained.[3] Both appellants appealed to the Board of Passport Appeals which recommended affirmance of the revocations. The Secretary of State subsequently approved the recommendations of the Board. The Secretary stated that he "relied solely on the evidence in the record" and that, as the basis of his decision, he:

> "specifically adopted as his own the [Board's] finding of fact that 'at all material times [appellants were members] of the Communist Party of the United States with knowledge or notice that such organization had been required to register as a Communist organization under the Subversive Activities Control Act.' "

Appellants thereupon filed separate complaints seeking declaratory and injunctive relief in the United States District Court for the District of Columbia. The complaints, which have been considered together, asked that judgments be entered declaring § 6 of the Subversive Activities Control Act unconstitutional and ordering the Secretary of State to issue passports to appellants. Each appellant-plaintiff alleged that § 6 was unconstitutional as, *inter alia,* "a deprivation without due process of law

---

[3] Appellants do not question that the hearings afforded them procedural due process of law. Cf. *Greene* v. *McElroy,* 360 U. S. 474.

of plaintiff's constitutional liberty to travel abroad, in violation of the Fifth Amendment to the Constitution of the United States." [4]   Appellants conceded that the Secretary of State had an adequate basis for finding that they were members of the Communist Party of the United States and that the action revoking their passports was proper if § 6 was constitutional.   The parties agreed that all administrative remedies had been exhausted and that it would be futile, and indeed a criminal offense, for either appellant to apply for a passport while remaining a member of the Communist Party.

The three-judge District Court, which was convened to review the constitutional question, rejected appellants' contentions, sustained the constitutionality of § 6 of the Control Act, and granted the Secretary's motion for summary judgment.   219 F. Supp. 709.   The court concluded that:

> "the enactment by Congress of section 6, which prohibits these plaintiffs from obtaining passports so long as they are members of an organization—in this case the Communist Party—under a final order to register with the Attorney General . . . is a valid exercise of the power of Congress to protect and preserve our Government against the threat posed by the world Communist movement and that the regu-

---

[4] Each complaint further alleged that § 6 was unconstitutional as: "(b) an abridgement of plaintiff's freedoms of speech, press and assembly, in violation of the First Amendment, (c) a penalty imposed on plaintiff without a judicial trial, and therefore a bill of attainder, in violation of Article I, section 9 of the Constitution, (d) a deprivation of plaintiff's right to trial by jury as required by the Fifth and Sixth Amendments and Article III, section 2, clause 3 of the Constitution, and (e) the imposition of a cruel and unusual punishment in violation of the Eighth Amendment."

Our disposition of this case makes it unnecessary to review these contentions.

latory scheme bears a reasonable relation thereto."
*Id.*, at 714.

This Court noted probable jurisdiction. 375 U. S. 928.

Appellants attack § 6, both on its face and as applied, as an unconstitutional deprivation of the liberty guaranteed in the Bill of Rights. The Government, while conceding that the right to travel is protected by the Fifth Amendment, contends that the Due Process Clause does not prevent the reasonable regulation of liberty and that § 6 is a reasonable regulation because of its relation to the danger the world Communist movement presents for our national security. Alternatively, the Government argues that "whether or not denial of passports to some members of the Communist Party might be deemed not reasonably related to national security, surely Section 6 was reasonable as applied to the top-ranking Party leaders involved here."

We hold, for the reasons stated below, that § 6 of the Control Act too broadly and indiscriminately restricts the right to travel and thereby abridges the liberty guaranteed by the Fifth Amendment.

## I.

In 1958 in *Kent* v. *Dulles,* 357 U. S. 116, 127, this Court declared that the right to travel abroad is "an important aspect of the citizen's 'liberty' " guaranteed in the Due Process Clause of the Fifth Amendment. The Court stated that:

> "The right to travel is a part of the 'liberty' of which the citizen cannot be deprived without due process of law under the Fifth Amendment. . . . Freedom of movement across frontiers in either direction, and inside frontiers as well, was a part of our heritage. Travel abroad, like travel within the country, . . . may be as close to the heart of the

individual as the choice of what he eats, or wears, or reads. Freedom of movement is basic in our scheme of values." [5]  *Id.,* at 125–126.

In *Kent,* however, the Court concluded that Congress had not conferred authority upon the Secretary of State to deny passports because of alleged Communist beliefs and associations. Therefore, although the decision protected the constitutional right to travel, the Court did not examine "the extent to which it can be curtailed." *Id.,* at 127. The Court, referring to § 6 of the Subversive Activities Control Act, noted that "the only law which Congress has passed expressly curtailing the movement of Communists across our borders has not yet become effective." *Id.,* at 130. Two years later in *Communist Party of the United States* v. *Subversive Activities Control Board, supra,* this Court reviewed and upheld the registration requirement of § 7 of the Control Act. The Court, however, did not pass upon the "various consequences of the Party's registration for its individual members," *id.,* at 70, because:

"It is wholly speculative now to foreshadow whether, or under what conditions, a member of the Party may in the future *apply for a passport,* or seek government or defense-facility or labor-union employment, or, being an alien, become a party to a naturalization or a denaturalization proceeding. None of these things may happen. If they do, appropriate administrative and judicial procedures will be available to test the constitutionality of applications of particular sections of the Act to particular persons in

---

[5] In *Bolling* v. *Sharpe,* 347 U. S. 497, 499–500, this Court stated that: "Although the Court has not assumed to define 'liberty' with any great precision, that term is not confined to mere freedom from bodily restraint. Liberty under law extends to the full range of conduct which the individual is free to pursue, and it cannot be restricted except for a proper governmental objective."

particular situations. Nothing justifies previsioning those issues now." *Id.*, at 79. (Emphasis added.)

The present case, therefore, is the first in which this Court has been called upon to consider the constitutionality of the restrictions which § 6 imposes on the right to travel.

The substantiality of the restrictions cannot be doubted. The denial of a passport, given existing domestic and foreign laws, is a severe restriction upon, and in effect a prohibition against, world-wide foreign travel. Present laws and regulations make it a crime for a United States citizen to travel outside the Western Hemisphere or to Cuba without a passport. By its plain import § 6 of the Control Act effectively prohibits travel anywhere in the world outside the Western Hemisphere by members of any "Communist organization"—including "Communist-action" and "Communist-front" organizations.[6] The restrictive effect of the legislation cannot be gainsaid by emphasizing, as the Government seems to do, that a member of a registering organization could recapture his freedom to travel by simply in good faith abandoning his membership in the organization. Since freedom of association is itself guaranteed in the First Amendment,[7] restrictions imposed upon the right to travel cannot be dismissed by asserting that the right to travel could be fully exercised if the individual would first yield up his membership in a given association.

Although previous cases have not involved the constitutionality of statutory restrictions upon the right to travel

[6] See note 1, *supra.*

[7] *E. g., Brotherhood of Railroad Trainmen* v. *Virginia State Bar,* 377 U. S. 1; *Gibson* v. *Florida Legislative Investigation Comm.,* 372 U. S. 539; *NAACP* v. *Button,* 371 U. S. 415; *Louisiana ex rel. Gremillion* v. *NAACP,* 366 U. S. 293; *Shelton* v. *Tucker,* 364 U. S. 479; *Bates* v. *City of Little Rock,* 361 U. S. 516; *NAACP* v. *Alabama ex rel. Patterson,* 357 U. S. 449; *Schneider* v. *State,* 308 U. S. 147.

abroad, there are well-established principles by which to test whether the restrictions here imposed are consistent with the liberty guaranteed in the Fifth Amendment. It is a familiar and basic principle, recently reaffirmed in *NAACP* v. *Alabama,* 377 U. S. 288, 307, that "a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." See, *e. g., NAACP* v. *Button,* 371 U. S. 415, 438; *Louisiana ex rel. Gremillion* v. *NAACP,* 366 U. S. 293; *Shelton* v. *Tucker,* 364 U. S. 479, 488; *Schware* v. *Board of Bar Examiners,* 353 U. S. 232, 239; *Martin* v. *Struthers,* 319 U. S. 141, 146–149; *Cantwell* v. *Connecticut,* 310 U. S. 296, 304–307; *Schneider* v. *State,* 308 U. S. 147, 161, 165. In applying this principle the Court in *NAACP* v. *Alabama, supra,* referred to the criteria enunciated in *Shelton* v. *Tucker, supra,* at 488:

> "[E]ven though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose."

This principle requires that we consider the congressional purpose underlying § 6 of the Control Act.[8]

---

[8] The purpose of the Act is stated in § 2. 64 Stat. 987, 50 U. S. C. § 781. Congress found, as is generally stated in § 2 (1), that there "exists a world Communist movement . . . whose purpose it is, by treachery, deceit, infiltration . . . , espionage, sabotage, terrorism, and any other means deemed necessary, to establish a Communist totalitarian dictatorship in the countries throughout the world through the medium of a world-wide Communist organization." Congress concluded, as stated in § 2 (15), that the "Communist organization in the United States" and the world Communist movement present a

The Government emphasizes that the legislation in question flows, as the statute itself declares, from the congressional desire to protect our national security. That Congress under the Constitution has power to safeguard our Nation's security is obvious and unarguable. Cf. *Kennedy* v. *Mendoza-Martinez,* 372 U. S. 144, 159–160. As we said in *Mendoza-Martinez,* "while the Constitution protects against invasions of individual rights, it is not a suicide pact." *Id.,* at 160. At the same time the Constitution requires that the powers of government "must be so exercised as not, in attaining a permissible end, unduly to infringe" a constitutionally protected freedom. *Cantwell* v. *Connecticut, supra,* at 304.

Section 6 provides that any member of a Communist organization which has registered or has been ordered to register commits a crime if he attempts to use or obtain a United States passport. The section applies to members who act "with knowledge or notice" that the organization is under a final registration order. "Notice" is specifically defined in § 13 (k). That section provides that publication in the Federal Register of the fact of registration or of issuance of a final registration order "shall constitute notice to all members of such organization that such order has become final." Thus the terms of § 6 apply whether or not the member actually knows or believes that he is associated with what is deemed to be a "Communist-action" or a "Communist-front" organi-

---

danger to the security of the United States, a danger requiring legislative action. The congressional purpose in adopting § 6 is more specifically stated in § 2 (8):

"Due to the nature and scope of the world Communist movement, with the existence of affiliated constituent elements working toward common objectives in various countries of the world, travel of Communist members, representatives, and agents from country to country facilitates communication and is a prerequisite for the carrying on of activities to further the purposes of the Communist movement."

510

zation. The section also applies whether or not one knows or believes that he is associated with an organization operating to further aims of the world Communist movement and "to establish a Communist totalitarian dictatorship in the countries throughout the world . . . ." 64 Stat. 987, 50 U. S. C. § 781 (1). The provision therefore sweeps within its prohibition both knowing and unknowing members. In related contexts this Court has had occasion to consider the substantiality of the relationship between an individual and a group where, as here, the fact of membership in that group has been made the sole criterion for limiting the individual's freedom. In *Wieman* v. *Updegraff*, 344 U. S. 183, the Court held that the due process guarantee of the Constitution was violated when a State, in an attempt to bar disloyal individuals from its employ, excluded persons solely on the basis of organizational memberships without regard to their knowledge concerning the organizations to which they had belonged. The Court concluded that: "Indiscriminate classification of innocent with knowing activity must fall as an assertion of arbitrary power." *Id.*, at 191.

Section 6 also renders irrelevant the member's degree of activity in the organization and his commitment to its purpose. These factors, like knowledge, would bear on the likelihood that travel by such a person would be attended by the type of activity which Congress sought to control. As the Court has elsewhere noted, "men in adhering to a political party or other organization notoriously do not subscribe unqualifiedly to all of its platforms or asserted principles." Cf. *Schneiderman* v. *United States*, 320 U. S. 118, 136. It was in this vein that the Court in *Schware* v. *Board of Bar Examiners*, 353 U. S., at 246, stated that even "[a]ssuming that some members of the Communist Party . . . had illegal aims and engaged in illegal activities, it cannot auto-

matically be inferred that all members shared their evil purposes or participated in their illegal conduct." Section 6, however, establishes an irrebuttable presumption that individuals who are members of the specified organizations will, if given passports, engage in activities inimical to the security of the United States.[9]

In addition to the absence of criteria linking the bare fact of membership to the individual's knowledge, activity or commitment, § 6 also excludes other considerations which might more closely relate the denial of passports to the stated purpose of the legislation. The prohibition of § 6 applies regardless of the purposes for which an individual wishes to travel. Under the statute it is a crime for a notified member of a registered organization to apply for a passport to travel abroad to visit a sick relative, to receive medical treatment, or for any other wholly innocent purpose.[10] In determining whether

---

[9] The provision in question cannot, as the Government admits, be limited by adopting an interpretation analogous to this Court's interpretation of the so-called "membership clause" in the Smith Act. In *Scales* v. *United States,* 367 U. S. 203, the Smith Act, which imposes criminal penalties for membership, was interpreted to include only " 'active' members having also a guilty knowledge and intent." *Id.,* at 228. The membership clause in that case, however, explicitly required "that a defendant must have knowledge of the organization's illegal advocacy." *Id.,* at 221. That requirement was intimately connected with the construction limiting membership to "active" members. With regard to the Control Act, however, as the Government concedes, "neither the words nor history of Section 6 suggests limiting its application to 'active' members."

[10] In denying appellants passports the Secretary of State made no finding as to their purposes in traveling abroad. The statute, as noted, supports the Secretary's implicit conclusion that such a finding was irrelevant. Appellants, however, in their respective complaints stated their purposes. Appellant Aptheker alleged that:

"He desires to travel to countries of Europe and elsewhere for study and recreation, to observe social, political and economic conditions

there has been an abridgment of the Fifth Amendment's guarantee of liberty, this Court must recognize the danger of punishing a member of a Communist organization "for his adherence to lawful and constitutionally protected purposes, because of other and unprotected purposes which he does not necessarily share." *Noto* v. *United States,* 367 U. S. 290, 299–300; *Scales* v. *United States,* 367 U. S. 203, 229–230. In addition it must be noted that § 6 applies to a member regardless of the security-sensitivity of the areas in which he wishes to travel. As a result, if a notified member of a registered organization were to apply for a passport to visit a relative in Ireland, or to read rare manuscripts in the Bodleian Library of Oxford University, the applicant would be guilty of a crime; whereas, if he were to travel to Canada or Latin America to carry on criminal activities directed against the United States, he could do so free from the prohibitive reach of § 6.

In determining the constitutionality of § 6, it is also important to consider that Congress has within its power "less drastic" [11] means of achieving the congressional ob-

---

abroad, and thereafter to write, publish, teach and lecture in this country about his observations. He also desires to travel abroad in order to attend meetings of learned societies and to fulfill invitations to lecture abroad."

Appellant Flynn alleged that:

"[She] desires to travel to countries of Europe and elsewhere for recreation and study, to observe social, political and economic conditions abroad, and thereafter to write, publish and lecture about her observations."

[11] The abridgment of liberty involved in this case is more "drastic" than, and distinguishable from, that involved in *American Communications Assn.* v. *Douds,* 339 U. S. 382. In *Douds* the Court upheld § 9 (h) of the National Labor Relations Act as amended by the Taft-Hartley Act, 61 Stat. 136, 146, 29 U. S. C. § 159 (h), which conditions trade-union access to the facilities of the National Labor Rela-

jective of safeguarding our national security. *Shelton* v. *Tucker,* 364 U. S., at 488. The Federal Employee Loyalty Program, which was before this Court in *Joint Anti-Fascist Refugee Comm.* v. *McGrath,* 341 U. S. 123, provides an example. Under Executive Order No. 9835, membership in a Communist organization is not considered conclusive but only as one factor to be weighed in determining the loyalty of an applicant or employee.[12]

---

tions Board upon the submission of non-Communist affidavits by officers of the union. Although the requirement undoubtedly discouraged unions from choosing officers with Communist affiliations, it did not prohibit their election and did not affect basic individual rights to work and to union membership.

[12] In 1950 the Assistant to the Attorney General of the United States, Peyton Ford, expressed to Congress the views of the Department of Justice with regard to a proposed government loyalty bill which predicated a conclusive presumption of disloyalty on the fact of organizational membership. Mr. Ford said:

"A world of difference exists, from the standpoint of sound policy and constitutional validity, between making, as the bill would, membership in an organization designated by the Attorney General a felony, and recognizing such membership, as does the employee loyalty program under Executive Order 9835, as merely one piece of evidence pointing to possible disloyalty. The bill would brand the member of a listed organization a felon, no matter how innocent his membership; the loyalty program enables the member to respond to charges against him and to show, in a manner consistent with American concepts of justice and fairness, that his membership is innocent and does not reflect upon his loyalty.

". . . It does not appear, therefore, necessary, even if constitutionally possible, to add to existing law and regulations at the present time a penal statute such as proposed in the bill.

"The foregoing comments represent the considered views of this Department, having in mind that it is the duty of the Attorney General to protect the rights of individuals guaranteed by the Constitution, as well as to protect the Government from subversion." Hearings on H. R. 3903 and H. R. 7595 before the House Committee on Un-American Activities, 81st Cong., 2d Sess., 2125.

It is relevant to note that less than a month after the decision in *Kent* v. *Dulles, supra,* President Eisenhower sent a message to Congress stating that: "Any limitations on the right to travel can only be tolerated in terms of overriding requirements of our national security, and must be subject to substantive and procedural guaranties." Message from the President—Issuance of Passports, H. Doc. No. 417, 85th Cong., 2d Sess.; 104 Cong. Rec. 13046. The legislation which the President proposed did not make membership in a Communist organization, without more, a disqualification for obtaining a passport. S. 4110, H. R. 13318, 85th Cong., 2d Sess. Irrespective of views as to the validity of this or other such proposals, they demonstrate the conviction of the Executive Branch that our national security can be adequately protected by means which, when compared with § 6, are more discriminately tailored to the constitutional liberties of individuals.

In our view the foregoing considerations compel the conclusion that § 6 of the Control Act is unconstitutional on its face. The section, judged by its plain import and by the substantive evil which Congress sought to control, sweeps too widely and too indiscriminately across the liberty guaranteed in the Fifth Amendment. The prohibition against travel is supported only by a tenuous relationship between the bare fact of organizational membership and the activity Congress sought to proscribe. The broad and enveloping prohibition indiscriminately excludes plainly relevant considerations such as the individual's knowledge, activity, commitment, and purposes in and places for travel. The section therefore is patently not a regulation "narrowly drawn to prevent the supposed evil," cf. *Cantwell* v. *Connecticut,* 310 U. S., at 307, yet here, as elsewhere, precision must be the touchstone of legislation so affecting basic freedoms, *NAACP* v. *Button,* 371 U. S., at 438.

## II.

The Government alternatively urges that, if § 6 cannot be sustained on its face, the prohibition should nevertheless be held constitutional as applied to these particular appellants. The Government argues that "surely Section 6 was reasonable as applied to the top-ranking Party leaders involved here." [13]   It is not disputed that appellants are top-ranking leaders: Appellant Aptheker is editor of *Political Affairs,* the "theoretical organ" of the Party in this country and appellant Flynn is chairman of the Party.[14]

It must be remembered that "[a]lthough this Court will often strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of a statute . . ." or judicially rewriting it. *Scales* v. *United States, supra,* at 211. To put the matter another way, this Court will not consider the abstract question of whether Congress might have enacted a valid statute but instead must ask whether the statute that Congress did enact will permissibly bear a construction rendering it free from constitutional defects.

The clarity and preciseness of the provision in question make it impossible to narrow its indiscriminately cast and overly broad scope without substantial rewriting. The situation here is different from that in cases such as *United States* v. *National Dairy Products Corp.,* 372 U. S. 29, where the Court is called upon to consider the content

---

[13] The Government recognizes, however, that: "Membership, or even leadership, in the Communist Party is not automatically a crime."   Brief for Petitioner on Petition for a Writ of Certiorari, p. 11, *United States* v. *Communist Party of the United States,* No. 1027, O. T. 1963, *cert. denied,* 377 U. S. 968.

[14] For appellants' alleged purposes in traveling, see note 10, *supra.*

of allegedly vague statutory language. Here, in contrast, an attempt to "construe" the statute and to probe its recesses for some core of constitutionality would inject an element of vagueness into the statute's scope and application; the plain words would thus become uncertain in meaning only if courts proceeded on a case-by-case basis to separate out constitutional from unconstitutional areas of coverage. This course would not be proper, or desirable, in dealing with a section which so severely curtails personal liberty.

Since this case involves a personal liberty protected by the Bill of Rights, we believe that the proper approach to legislation curtailing that liberty must be that adopted by this Court in *NAACP* v. *Button,* 371 U. S. 415, and *Thornhill* v. *Alabama,* 310 U. S. 88. In *NAACP* v. *Button* the Court stated that:

> "[I]n appraising a statute's inhibitory effect upon such rights, this Court has not hesitated to take into account possible applications of the statute in other factual contexts besides that at bar. *Thornhill* v. *Alabama,* 310 U. S. 88, 97–98; *Winters* v. *New York,* [333 U. S. 507], 518–520. Cf. *Staub* v. *City of Baxley,* 355 U. S. 313. . . . The objectionable quality of vagueness and overbreadth does not depend upon absence of fair notice to a criminally accused or upon unchanneled delegation of legislative powers, but upon the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application. Cf. *Marcus* v. *Search Warrant,* 367 U. S. 717, 733. These freedoms are delicate and vulnerable, as well as supremely precious in our society. The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions." 371 U. S., at 432–433.

For essentially the same reasons this Court had concluded that the constitutionality of the statute in *Thornhill* v. *Alabama* should be judged on its face:

> "An accused, after arrest and conviction under such a statute [on its face unconstitutionally abridging freedom of speech], does not have to sustain the burden of demonstrating that the State could not constitutionally have written a different and specific statute covering his activities as disclosed by the charge and the evidence introduced against him." 310 U. S., at 98.[15]

Similarly, since freedom of travel is a constitutional liberty closely related to rights of free speech and association, we believe that appellants in this case should not be required to assume the burden of demonstrating that Congress could not have written a statute constitutionally prohibiting their travel.[16]

Accordingly the judgment of the three-judge District Court is reversed and the cause remanded for proceedings in conformity with this opinion.

*Reversed and remanded.*

MR. JUSTICE BLACK, concurring.

Section 6 of the Subversive Activities Control Act makes it a felony for a member of a "Communist," "Communist-action," or "Communist-front" organization to apply for, use, or attempt to use a passport for travel

---

[15] See Freund, The Supreme Court of the United States (1961), pp. 67–69; Note, 61 Harv. L. Rev. 1208 (1948); Note, 109 U. Pa. L. Rev. 67, 75–85 (1960).

[16] Nor in our opinion should the Secretary of State or other government officers be exposed to the risk of criminal penalties for violating § 6 (b) by issuing a passport to a member of a registered Communist-action organization who is subsequently found by a court to be a person whose travel, contrary to the belief of the government officer, could constitutionally be prohibited.

abroad. I concur in the Court's holding that this section of the Act is unconstitutional, but not on the ground that the Due Process Clause of the Fifth Amendment, standing alone, confers on all our people a constitutional liberty to travel abroad at will. Without reference to other constitutional provisions, Congress has, in my judgment, broad powers to regulate the issuance of passports under its specific power to regulate commerce with foreign nations. The Due Process Clauses of the Fifth and Fourteenth Amendments do mean to me, however, that neither the Secretary of State nor any other government agent can deny people in this country their liberty to travel or their liberty to do anything else except in accordance with the "law of the land" as declared by the Constitution or by valid laws made pursuant to it. For reasons stated in my dissenting opinion in *Communist Party* v. *Subversive Activities Control Board,* 367 U. S. 1, 137, I think the whole Act, including § 6, is not a valid law, that it sets up a comprehensive statutory plan which violates the Federal Constitution because (1) it constitutes a "Bill of Attainder," which Art. I, § 9, of the Constitution forbids Congress to pass; (2) it penalizes and punishes appellants and restricts their liberty on legislative and administrative fact-findings that they are subversives, and in effect traitors to their country, without giving them the benefit of a trial according to due process, which requires a trial by jury before an independent judge, after an indictment, and in accordance with all the other procedural protections of the Fourth, Fifth, and Sixth Amendments; and (3) it denies appellants the freedom of speech, press, and association which the First Amendment guarantees.

The Subversive Activities Control Act is supposed to be designed to protect this Nation's "internal security." This case offers another appropriate occasion to point out that the Framers thought (and I agree) that the best way

to promote the internal security of our people is to protect their First Amendment freedoms of speech, press, religion and assembly, and that we cannot take away the liberty of groups whose views most people detest without jeopardizing the liberty of all others whose views, though popular today, may themselves be detested tomorrow.

MR. JUSTICE DOUGLAS, concurring.

While I join the opinion of the Court, I add only a few words to indicate what I think is the basic reach of the problem before us.

We noted in *Kent* v. *Dulles,* 357 U. S. 116, 126, that "freedom of movement," both internally and abroad, is "deeply engrained" in our history. I would not suppose that a Communist, any more than an indigent, could be barred from traveling interstate. I think that a Communist, the same as anyone else, has this right. Being a Communist certainly is not a crime; and while traveling may increase the likelihood of illegal events happening, so does being alive. If, as I think, the right to move freely from State to State is a privilege and immunity of national citizenship (see *Edwards* v. *California,* 314 U. S. 160, 178), none can be barred from exercising it, though anyone who uses it as an occasion to commit a crime can of course be punished. But the right remains sacrosanct, only illegal conduct being punishable.

Free movement by the citizen is of course as dangerous to a tyrant as free expression of ideas or the right of assembly and it is therefore controlled in most countries in the interests of security. That is why riding boxcars carries extreme penalties in Communist lands. That is why the ticketing of people and the use of identification papers are routine matters under totalitarian regimes, yet abhorrent in the United States.

Freedom of movement, at home and abroad, is important for job and business opportunities—for cultural,

political, and social activities—for all the commingling which gregarious man enjoys. Those with the right of free movement use it at times for mischievous purposes. But that is true of many liberties we enjoy. We nevertheless place our faith in them, and against restraint, knowing that the risk of abusing liberty so as to give rise to punishable conduct is part of the price we pay for this free society.

Freedom of movement is kin to the right of assembly and to the right of association. These rights may not be abridged, *De Jonge* v. *Oregon,* 299 U. S. 353; *NAACP* v. *Alabama,* 357 U. S. 449, 460–462, only illegal conduct being within the purview of crime in the constitutional sense.

War may be the occasion for serious curtailment of liberty. Absent war, I see no way to keep a citizen from traveling within or without the country, unless there is power to detain him. *Ex parte Endo,* 323 U. S. 283. And no authority to detain exists except under extreme conditions, *e. g.,* unless he has been convicted of a crime or unless there is probable cause for issuing a warrant of arrest by standards of the Fourth Amendment. This freedom of movement is the very essence of our free society, setting us apart. Like the right of assembly and the right of association, it often makes all other rights meaningful— knowing, studying, arguing, exploring, conversing, observing and even thinking. Once the right to travel is curtailed, all other rights suffer, just as when curfew or home detention is placed on a person.

America is of course sovereign; but her sovereignty is woven in an international web that makes her one of the family of nations. The ties with all the continents are close—commercially as well as culturally. Our concerns are planetary, beyond sunrises and sunsets. Citizenship implicates us in those problems and perplexities, as

well as in domestic ones. We cannot exercise and enjoy citizenship in world perspective without the right to travel abroad; and I see no constitutional way to curb it unless, as I said, there is the power to detain.

MR. JUSTICE CLARK, whom MR. JUSTICE HARLAN joins and whom MR. JUSTICE WHITE joins in part, dissenting.

## I.

The Court refuses to consider the constitutionality of § 6 of the Subversive Activities Control Act as applied to the appellants in this case, Elizabeth Gurley Flynn, the Chairman of the Communist Party of the United States, and Herbert Aptheker, the editor of the Party's "theoretical organ," *Political Affairs.* Instead, the Court declares the section invalid on its face under the Fifth Amendment. This is contrary to the long-prevailing practice of this Court. As we said in *United States* v. *Raines,* 362 U. S. 17, 20–21 (1960):

> "The very foundation of the power of the federal courts to declare Acts of Congress unconstitutional lies in the power and duty of those courts to decide cases and controversies properly before them. This was made patent in the first case here exercising that power—'the gravest and most delicate duty that this Court is called on to perform.' [Holmes, J., in *Blodgett* v. *Holden,* 275 U. S. 142, 148.] *Marbury* v. *Madison,* 1 Cranch 137, 177–180. This Court, as is the case with all federal courts, 'has no jurisdiction to pronounce any statute, either of a State or of the United States, void, because irreconcilable with the Constitution, except as it is called upon to adjudge the legal rights of litigants in actual controversies. In the exercise of that jurisdiction, it is bound by two rules, to which it has rigidly adhered,

one, never to anticipate a question of constitutional law in advance of the necessity of deciding it; the other never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.' *Liverpool, New York & Philadelphia S. S. Co.* v. *Commissioners of Emigration,* 113 U. S. 33, 39. Kindred to these rules is the rule that one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional. *United States* v. *Wurzbach,* 280 U. S. 396; *Heald* v. *District of Columbia,* 259 U. S. 114, 123; *Yazoo & Mississippi Valley R. Co.* v. *Jackson Vinegar Co.,* 226 U. S. 217; *Collins* v. *Texas,* 223 U. S. 288, 295–296; *New York ex rel. Hatch* v. *Reardon,* 204 U. S. 152, 160–161. Cf. *Voeller* v. *Neilston Warehouse Co.,* 311 U. S. 531, 537; *Carmichael* v. *Southern Coal & Coke Co.,* 301 U. S. 495, 513; *Virginian R. Co.* v. *System Federation,* 300 U. S. 515, 558; *Blackmer* v. *United States,* 284 U. S. 421, 442; *Roberts & Schaefer Co.* v. *Emmerson,* 271 U. S. 50, 54–55; *Jeffrey Mfg. Co.* v. *Blagg,* 235 U. S. 571, 576; *Tyler* v. *Judges of the Court of Registration,* 179 U. S. 405; *Ashwander* v. *TVA,* 297 U. S. 288, 347–348 (concurring opinion)."

Indeed, only last Term we specifically held in *United States* v. *National Dairy Products Corp.,* 372 U. S. 29, 36 (1963):

"In this connection we also note that the approach to 'vagueness' governing a case like this is different from that followed in cases arising under the First Amendment. There we are concerned with the vagueness of the statute 'on its face'. . . . [In

other cases we also consider the statute] in the light of the conduct to which it is applied."

The Court says that *National Dairy* is not apposite, citing *Thornhill* v. *Alabama,* 310 U. S. 88, and *NAACP* v. *Button,* 371 U. S. 415. But *Thornhill* and *Button* are First Amendment cases, while the holding of this case is based on the Fifth Amendment's guarantee of the right to travel abroad. *Kent* v. *Dulles,* 357 U. S. 116, 127 (1958). Consequently they are not apposite here.

As applied to the prosecution of the Communist Party's top dignitaries, the section is clearly constitutional. The only objections the Court finds to the language of Congress are that it makes the section applicable: (1) "whether or not the member [of the Party] actually knows or believes that he is associated with what is deemed to be a 'Communist-action' or a 'Communist-front' organization"; (2) "whether or not one knows or believes that he is associated with an organization operating to further aims of the world Communist movement and 'to establish a Communist totalitarian dictatorship in the countries throughout the world . . . .' " Let us discuss these objections seriatim:

(1) There is a finding here—not under attack—that Mrs. Flynn "was an active, participating and continuous member of the Communist Party of the United States; was active in the Party's affairs and its organization; and indeed was and still is one of its principal officials." Likewise there is a finding—not under attack—as to Aptheker that he "[Aptheker] makes it quite clear in his own words that he has been a member of the Communist Party since 1939 and that he is very proud of this association and will do whatever he can to further the aims and goals of the Party." The record shows that both Flynn and Aptheker were witnesses in behalf of the Party in the registration proceeding which resulted in

the Party's being ordered to register as a Communist-action organization. *Communist Party* v. *Subversive Activities Control Board,* 367 U. S. 1 (1961). In addition, Mrs. Flynn was convicted under the Smith Act. See *United States* v. *Flynn,* 216 F. 2d 354 (1954). In view of these circumstances, no one could say with truth that the appellants did not know that they were associated with a Communist-action organization. In fact, neither appellant claims lack of notice or knowledge of the requirements of the section.

(2) As to knowledge that the Communist Party is involved in a world Communist movement aimed at establishing a totalitarian Communist dictatorship in countries throughout the world, Congress made specific findings in the Subversive Activities Control Act of 1950 (the very statute under which the hearing was held at which petitioners testified for the Party) and in the Communist Control Act of 1954 that: "the Communist Party of the United States . . . is in fact an instrumentality of a conspiracy to overthrow the Government of the United States," 68 Stat. 775; "the policies and programs of the Communist Party are secretly prescribed for it by the foreign leaders of the world Communist movement," *ibid.;* this control is in a "Communist dictatorship of a foreign country," whose purpose is "to establish a Communist totalitarian dictatorship in the countries throughout the world," 64 Stat. 987; and this is to be accomplished by "action organizations" in various countries which seek "the overthrow of existing governments by any available means," *id.,* at 988. These findings of the Congress, like those of the Examiner which are not under attack here, are binding on this Court. *Communist Party* v. *Control Board, supra.* There we said:

"It is not for the courts to re-examine the validity of these legislative findings and reject them. See

*Harisiades* v. *Shaughnessy,* 342 U. S. 580, 590. They are the product of extensive investigation by Committees of Congress over more than a decade and a half. Cf. *Nebbia* v. *New York,* 291 U. S. 502, 516, 530. We certainly cannot dismiss them as unfounded or irrational imaginings. See *Galvan* v. *Press,* 347 U. S. 522, 529; *American Communications Assn.* v. *Douds,* 339 U. S. 382, 388–389." At 94–95.

It is, therefore, difficult for me to see how it can be said rationally that these appellants—top Party functionaries who testified on behalf of the Party in the registration proceeding involved in *Communist Party* v. *Control Board, supra*—did not know that they were "associated with an organization operating to further aims of the world Communist movement and 'to establish a Communist totalitarian dictatorship in the countries throughout the world . . . .' "

How does the Court escape? It says that the section "sweeps within its prohibition both knowing and unknowing members." But we have no "unknowing members" before us. Neither appellant contests these findings. All we have are irrational imaginings: a member of the Party might wish "to visit a relative in Ireland, or to read rare manuscripts in the Bodleian Library of Oxford University . . . ." But no such party is here and no such claim is asserted. It will be soon enough to test this situation when it comes here.

## II.

Nor do I believe the section invalid "on its face." While the right to travel abroad is a part of the liberty protected by the Fifth Amendment, the Due Process Clause does not prohibit reasonable regulation of life, liberty or property. Here the restriction is reasonably

related to the national security. As we said in *Barenblatt* v. *United States,* 360 U. S. 109, 127–128 (1959):

> "That Congress has wide power to legislate in the field of Communist activity in this Country, and to conduct appropriate investigations in aid thereof, is hardly debatable. The existence of such power has never been questioned by this Court . . . . In the last analysis this power rests on the right of self-preservation, 'the ultimate value of any society,' *Dennis* v. *United States,* 341 U. S. 494, 509."

The right to travel is not absolute. Congress had ample evidence that use of passports by Americans belonging to the world Communist movement is a threat to our national security. Passports were denied to Communists from the time of the Soviet Revolution until the early 30's and then again later in the 40's. In 1950 Congress determined, in the Subversive Activities Control Act, that foreign travel "is a prerequisite for the carrying on of activities to further the purposes of the Communist movement." 64 Stat. 988. The Congress had before it evidence that such use of passports by Communist Party members: enabled the leaders of the world Communist movement in the Soviet Union to give orders to their comrades in the United States and to exchange vital secrets as well; facilitated the training of American Communist leaders by experts in sabotage and the like in Moscow; gave closer central control to the world Communist movement; and, of utmost importance, provided world Communist leaders with passports for Soviet secret agents to use in the United States for espionage purposes.* This evidence afforded the Congress a rational

---

*In the proceeding which led to the order of the Subversive Activities Control Board directing the Communist Party to register, the Board heard evidence that the present leaders of the Communist Party in the United States have traveled to the Soviet Union on

basis upon which to place the denial of passports to members of the Communist Party in the United States. The denial is reasonably related to the national security. The degree of restraint upon travel is outweighed by the dangers to our very existence.

The remedy adopted by the Congress is reasonably tailored to accomplish the purpose. It may be true that not every member of the Party would endanger our national security by traveling abroad, but which Communist Party member is worthy of trust? Since the Party is a secret, conspiratorial organization subject to rigid discipline by Moscow, the Congress merely determined that it was not wise to take the risk which foreign travel by Communists entailed. The fact that all persons in a class may not engage in harmful conduct does not of itself make the classification invalid. *Westfall* v. *United States,* 274 U. S. 256, 259 (1927); *North American Co.* v. *Securities & Exchange Comm'n,* 327 U. S. 686, 710–711 (1946); *American Communications Assn.* v. *Douds,* 339 U. S. 382, 406 (1950). In *Schneiderman* v. *United States,* 320 U. S. 118, 132, 163, 172 (1943), this Court indicated that Congress might exclude *all* Communists from entering this country. And in *Hawker* v. *New York,* 170 U. S. 189 (1898), the Court upheld a state statute preventing *all* felons from practicing medicine; similarly, *all* aliens may be barred from operating pool halls, *Clarke* v. *Deckebach,* 274 U. S. 392, 396–397 (1927). More onerous burdens than those found in § 6 were placed on *all* union officers (whose organization was enjoying privileges under the National Labor Relations Act), who were barred from their offices (and livelihood in that regard) if they were Communist Party members. *American Communications Assn.* v. *Douds, supra.* Likewise, this

Party business, have been indoctrinated and trained in Communist strategy and policies and have acted as couriers between the Communist Parties of the two countries.

Court approved the action of the Congress in authorizing deportation of *all* aliens who had been members of the Party. *Harisiades* v. *Shaughnessy*, 342 U. S. 580, 590 (1952); *Galvan* v. *Press*, 347 U. S. 522 (1954). We also upheld the vesting of power in the Attorney General to hold *all* Communist Party members without bail pending determination as to their deportability. *Carlson* v. *Landon*, 342 U. S. 524 (1952). In the realm of state power, Maryland was permitted to require *all* candidates to take an oath that they were not engaged in any attempt to overthrow the Government by force and violence, *Gerende* v. *Board of Supervisors*, 341 U. S. 56 (1951); Los Angeles was allowed to require *all* employees to take a non-Communist oath on penalty of discharge, *Garner* v. *Board of Public Works*, 341 U. S. 716 (1951); New York exercised similar powers over public school employees with our approval, *Adler* v. *Board of Education*, 342 U. S. 485 (1952); the States were permitted to discharge *all* teachers and "security agency" employees who refused to answer questions concerning their Communist affiliations, *Beilan* v. *Board of Public Education*, 357 U. S. 399 (1958); *Lerner* v. *Casey*, 357 U. S. 468 (1958); and California and Illinois were permitted to deny admission to the practice of law of *all* applicants who refused to answer questions as to their Communist affiliations, *Konigsberg* v. *State Bar*, 366 U. S. 36 (1961), and *In re Anastaplo*, 366 U. S. 82 (1961).

Nor do I subscribe to the loose generalization that individual guilt may be conclusively presumed from membership in the Party. One cannot consider the matter in isolation but must relate it to the subject matter involved and the legislative findings upon which the action is based. It is true that in *Scales* v. *United States*, 367 U. S. 203 (1961), the Court found that the intention of the Congress in the Smith Act was "to reach only 'active' members having also a guilty knowledge and intent." At

228. But that was a criminal prosecution under the Smith Act which, of course, carried stricter standards. And, in addition, this requirement, as laid down in *Scales,* was not held to be a constitutional mandate. The Court was merely interpreting a criminal statute which directly prohibits membership in organizations that come within its terms. The Act here does not prohibit membership, but merely restricts members in a field in which the Congress has found danger to our security. Nor is *Wieman* v. *Updegraff,* 344 U. S. 183 (1952), cited by the majority, apposite here. That case dealt with an oath based on membership in organizations on the Attorney General's list of subversive groups. The Act condemned the employee who was a member of any listed organization regardless of whether he actually knew the organization was so listed; furthermore, the statute proscribed past membership in the listed organizations. Here proof of actual membership is necessary and notice of registration or entry of a final order directing registration under the Act is required. Finally, the member of the Party here can avoid the Act's sanctions by terminating his membership, which was not possible in *Wieman.* Appellants also depend on *Adler* v. *Board of Education,* 342 U. S. 485 (1952), which upheld a statute with a rebuttable presumption that members of the Party supported Communist objectives. The Court did not hold that the opportunity to rebut was constitutionally required in the circumstances of that case, but even if it had, *Adler* would not control here. The evidence before Congress as to the danger to national security was of such strength that it warranted the denial of passports, a much less onerous disability than loss of employment.

For these reasons, I would affirm.

MR. JUSTICE WHITE joins in Section I of this dissent and for the reasons stated therein would affirm the judgment.