**UNITED STATES of America,**
**Plaintiff,**

v.

**Paul RAMIREZ and Francisco Moreno, Defendants.**

No. 00–20053–G/V.

United States District Court, W.D. Tennessee, Western Division.

Sept. 28, 2000.

Thomas L. Parker, Assistant U.S. Attorney, Memphis, TN, for Plaintiff.

Doris A. Randle–Holt, Assistant Federal Defender, Memphis, TN, for Defendant Ramirez.

Robert C. Brooks, Memphis, TN, for Defendant Moreno.

## ORDER DENYING MOTION TO SUPPRESS

GIBBONS, District Judge.

Before the court are defendants Paul Ramirez and Francisco Moreno's motions to suppress. The motion was referred to the United States Magistrate Judge for report and recommendation. The magistrate judge's report was filed August 21, 2000. Both defendants have filed objections to the report.

The court has reviewed the magistrate judge's report and recommendation, defendants' objections, and the transcript of the hearing before the magistrate judge. Based on a *de novo* review of the record before the magistrate judge, the court adopts the magistrate judge's report, except as to footnote 7, which is unnecessary to the result. The motion to suppress is denied.

## REPORT AND RECOMMENDATION

VESCOVO, United States Magistrate Judge.

Defendants Raul Ramirez and Francisco Moreno have been indicted for possession with intent to distribute approximately fifteen kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1). Both defendants have moved to suppress as violative of the Fourth Amendment the cocaine seized and statements made as a result of the warrantless search of their vehicle.

The motions were referred to the United States Magistrate Judge for an evidentiary hearing and report and recommendation. At the hearing held July 14, 2000, Detective Brady Valentine of the Memphis Police Department testified on behalf of the

government, and defendant Ramirez testified on his own behalf. Defendant Moreno did not testify. For the reasons that follow, it is recommended that the motions to suppress be denied.

## I. PROPOSED FINDINGS OF FACT

For the most part the facts of this case are undisputed and were captured on videotape. On March 9, 2000, at approximately 12:30 in the afternoon, Detective Brady Valentine of the Memphis Police Department Interdiction Unit parked his patrol car in the median of Interstate 240 near Watkins, within the Memphis city limits, and began operating stationary radar. He clocked some vehicles in the lane nearest to him traveling at 55 miles per hour and then observed a maroon Chrysler minivan in the lane furthest from him passing the cars that he had just clocked. Valentine did not clock the van but did notice that its windows were darkened.

Valentine initiated a traffic stop. As Valentine approached the van on the passenger side, he noticed that the van had North Carolina license plates visible on the rear and that there were two people inside the van. The passenger, defendant Moreno, rolled down his window, and Valentine leaned toward the window and asked the driver, defendant Ramirez, for his license. Detective Valentine advised both occupants that the reason he had stopped them was because of their tinted windows, "they are too dark, the darkest we allow in Tennessee is 35%." Ramirez produced a license, and Valentine then asked him to step out of the van.

Outside the van, Valentine first asked Ramirez in English where he had been. Ramirez responded in Spanish that he did not speak English. Valentine, who had taken a "survival Spanish" course at the police academy, then asked in Spanish where Ramirez had been. Ramirez responded "Las Vegas." Valentine next asked in Spanish where Ramirez was going. Ramirez responded "North Carolina." Valentine then asked in Spanish "whether there were drugs in the car." Ramirez nodded but look confused. Valentine clarified the question by asking in Spanish whether there was any cocaine or marijuana in the van, and Ramirez responded that there was not.

After obtaining Ramirez's consent to search the van, Valentine placed him in the rear of the squad car.[1] Valentine returned to the van and asked Moreno similar questions; Moreno's responses were consistent with Ramirez's. Since Moreno was the owner of the van, Valentine then obtained Moreno's consent to search and also placed him in the rear of the squad car.[2] Before searching the van, Valentine took no steps to run a license check on Ramirez's license, to check the car registration, or to determine if the windows of the van violated the tint law.

Valentine testified that when he initially approached the passenger side of the van, he made several immediate observations that suggested to him that the defendants were transporting drugs. First and foremost, he noticed a strong chemical "acidic type of acetone" odor which "slapped him in the face." He recognized the odor from a previous cocaine seizure. There were also three to four air fresheners in the car and two security devices—an after market key pad alarm and a "club." There were tools, including a small socket set and a screwdriver, lying around the van. Additionally, from his viewpoint outside the passenger side of the van, Valentine could not see any luggage in the van, and the passenger Ramirez acted nervous. In light of these observations, Valentine stated that his immediate concern became to search the vehicle, not the traffic stop.

Valentine searched the vehicle, beginning in the rear. In the rear of the van, he found duffel bags, but the bags contained clothes rather than drugs. Valentine then got down on his hands and knees

---

1. Valentine testified that he "invited" Ramirez in English to sit in the back of the squad car.

2. He likewise claimed to have "invited" Moreno to sit in the back of the squad car.

and looked under the van where he observed a false bottom welded onto the undercarriage of the van. Back inside the van, Valentine pulled up the carpet and located a trap door. He took a screwdriver and punctured the trap door, where he found the cocaine in question in the false compartment. Both defendants were then arrested.

The basis for the initial stop, according to Detective Valentine, was that he believed that the windows on the van had an excessive degree of tinting in violation of Tennessee law. To determine whether vehicle windows are too dark, the Tennessee Department of Safety provides each Memphis officer with a window tint comparison card to conduct field testing on the window tinting. One-half of the card is darkened, while the other half is lighter. The officer places the light side of the card behind the window, and if the window appears darker than the dark side of the card, then the window tint is excessive under Tennessee law. Prior to searching the vehicle, Detective Valentine never made a field comparison test. Later, after the arrest, he performed a comparison test and concluded that the windows were darker than the permissible tint under state law.

At the police academy, Memphis police officers are trained regarding municipal ordinances. According to Valentine's testimony, as a Memphis police officer, most of the tickets he writes are for violations of Memphis ordinances. Occasionally, he charges people with violations of state law, but he testified that he is not as familiar with Tennessee state laws as he is with the city ordinances. Valentine testified that he always thought that the Memphis ordinance on window tinting was identical to the state law. He claims to have been surprised to learn that the city ordinance and the state statute are not identical.

## II. PROPOSED CONCLUSIONS OF LAW

### A. The Initial Stop

■ The primary issue in this case is whether Detective Valentine had probable cause to stop the van. As this was a warrantless stop, the burden is on the government to prove probable cause. 5 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 11.2(B), p. 38 (3d ed.1996).

■ If a law enforcement officer has probable cause to believe that a traffic violation is occurring, he may stop the vehicle. See, e.g., Whren v. United States, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); United States v. Ferguson, 8 F.3d 385, 391 (6th Cir.1993). Probable cause is defined as being those "facts and circumstances ... such as to warrant a man of (reasonable) prudence and caution in believing that the offense has been committed." United States v. Watson, 423 U.S. 411, 432 n. 4, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976) (quoting Carroll v. United States, 267 U.S. 132, 161, 45 S.Ct. 280, 69 L.Ed. 543 (1925)). Here, the government urges that probable cause for a traffic stop existed because the windows on defendants' van were darkly tinted, which Detective Valentine believed to be "illegal in Tennessee."

Under Tennessee law, a vehicle may have some degree of tinting on its windows, but the darkness of the tinting is regulated by Tenn.Code Ann. § 55–9–107. That statute provides that:

(a)(1) It is unlawful for any person to operate, upon a public highway, street or road, any motor vehicle registered in this state, in which any window ... has been altered, treated or replaced by the affixing, application or installation of any material which:

(A) Has a visible light transmittance of less than thirty-five percent (35%); or

(B) With the exception of the manufacturer's standard installed shade band, reduces the visible light transmittance in the windshield below seventy percent (70%).

Tenn.Code Ann. § 55–9–107. By contrast the Memphis ordinance regarding window tinting, Section 21–338, states that:

(c) It shall be unlawful for any person to operate a motor vehicle upon a public highway, street or road, which has been altered, treated or replaced by the affixation, application or installation of any material which:

(1) Reduces the light transmittance in both front windows below eighteen (18) percent; or

(2) Causes the reflectance of any window to be more than thirty-five (35) percent.

Memphis City Code § 21–338.

There are at least two substantial differences between the state law and the city ordinance. First, the Tennessee state statute applies only to vehicles registered in the state of Tennessee, not to vehicles from other states that may be traveling through Tennessee. The Memphis ordinance contains no such limitation. Second, the Tennessee statute permits vehicles to have windows that transmit as little as 35 percent of light through the tinting. The Memphis ordinance, however, either by intent or poor drafting, makes it unlawful to have tinting that permits less than 65 percent of light through, and thus is nearly twice as restrictive as the state law.[3]

█ It is clear from the videotape in this case that the van the defendants were occupying had North Carolina license plates. Since an out-of-state car with tinted windows is not illegal under Tennessee law, Detective Valentine simply could not have had probable cause to believe that there was a violation of Tennessee law. The fact that Detective Valentine was mistaken as to the limits of the Tennessee statute does not give rise to a finding of probable cause; there is no good faith exception to warrantless stops.

█ Nevertheless, Detective Valentine insists that he did not know the Tennessee law applied only to cars registered in Tennessee and that he believed the Tennessee statute to be coextensive with the Memphis ordinance. The question therefore is whether Valentine had probable cause to believe the defendants were violating the municipal ordinance even though he clearly stated he stopped the defendants for a violation of the Tennessee law.[4] The tint on the windows appeared to reflect more than 35 percent of visible light, and the van was being driven along Interstate 240, a "public highway, street or road." Because the court believes that Detective Valentine was ignorant of the Tennessee state statute and that he was relying on his understanding of the Memphis ordinance as a basis for the stop, Detective Valentine therefore had probable cause to believe that defendants' van was being operated in violation of the Memphis ordinance regarding window tinting. Moreover, after observing his testimony, the court believes that Detective Valentine did not understand the tint distinctions between the Tennessee statute and the Memphis ordinance, even if he realized that such distinctions existed.

In this light, the Ninth Circuit recently examined a case in which an officer initiated a traffic stop of a vehicle for having tinted windows. *United States v. Wallace*, 213 F.3d 1216 (9th Cir.2000). The officer in *Wallace* believed that any tinting of windows was illegal under California law, when in fact tinting was lawful so long as the tinting permitted at least 70 percent light transmittance. The Ninth Circuit, in reversing the district court's order suppressing evidence found in defendant's vehicle, held that because a violation of the law was actually occurring—defendant's vehicle had windows tinted such that less than 70 percent of light was transmitted—probable cause existed for a stop despite the fact that the officer did not know pre-

---

**3.** The difference between the statutes arises from the different terminology—the state statute refers to windows with less than 35 percent "transmittance," while the Memphis ordinance refers to those with more than 35 percent "reflectance."

**4.** At the detention hearing on March 14, 2000, Valentine testified he was familiar with the State of Tennessee traffic laws and that he stopped the vehicle for violation of the Tennessee window tint law.' (Tr. Detention Hearing, pp. 9—22.)

cisely what the law was. While the Ninth Circuit's approach is somewhat extreme, the court submits that in the present case Detective Valentine's befuddlement as to whether the Memphis ordinance was identical to the state statute does not deprive the stop of probable cause under the Memphis ordinance. Thus, it is submitted that Detective Valentine had probable cause to believe the windows were illegally tinted and to initiate the traffic stop in this case.

Defendants strenuously urge, however, that the Memphis city ordinance is an unconstitutional infringement on the right to interstate travel and that the ordinance is preempted by the existence of a state statute. Such a constitutionally and legally infirm ordinance, they argue, does not provide a sufficient legal basis to establish probable cause for a traffic stop.

It is axiomatic that "individuals have the right to travel freely without being stopped and searched by police." *United States v. Buchanon,* 72 F.3d 1217 (6th Cir.1995). Moreover, any undue burden placed on the right to interstate travel is unconstitutional. *See United States v. Guest,* 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966); *Aptheker v. Secretary of State,* 378 U.S. 500, 518, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964) (Douglas, J., concurring); *Edwards v. California,* 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119 (1941). The Memphis ordinance, by regulating not only those vehicles that are registered in Tennessee but all vehicles passing through the state, however briefly, attempts to impose equipment limitations that burden the right to interstate travel. Under the Memphis ordinance, a vehicle that bears tinted windows which are perfectly legal in the state of the vehicle's registration may become unlawful merely by passing through the city of Memphis on a cross-country trip. It appears that such an ordinance unconstitutionally burdens the right to interstate travel.

Similarly, the court submits that the Memphis ordinance is invalid because it is preempted by the Tennessee state statute.[5] Under Tennessee law, issues of state-wide concern become the province of state statutes when the legislature has occupied the field and established a law. *See, e.g., State v. Mayor & Aldermen of Town of Fayetteville,* 196 Tenn. 407, 268 S.W.2d 330 (1954). Cities in Tennessee are prohibited from enacting ordinances that contravene a legislative act. *See Southern Railway Co. v. Knoxville,* 223 Tenn. 90, 96, 442 S.W.2d 619 (Tenn.1968) (holding that "municipal ordinances in conflict with and repugnant to a State law of a general character and state-wide application are universally held to be invalid."); *Bernard v. Sharp,* 481 S.W.2d 782, 783 (Tenn.Ct.App.1972). At least one scholar has noted that "as a general rule . . . a state motor vehicle code or law supersedes or prevails over all inconsistent municipal regulations. Accordingly, a municipal regulation conflicting with the state motor vehicle law is void and of no effect." McQuillin Mun. Corp. § 24.620 (3d ed.1999). In the present case, there is a specific state law that addresses the issue of window tinting, and the state legislature has determined that restrictions should only apply to those vehicles that are registered in this state and that up to 65 percent tinting should be permitted. Accordingly, the more restrictive Memphis ordinance conflicts with the purpose and intent of the state statute and is preempted by that statute.

■ Nevertheless, the fact that the Memphis ordinance may be preempted or unconstitutional is not determinative of whether Detective Valentine had probable cause to stop the van in this case or whether the evidence in this case should be excluded. The crucial question is whether the court should suppress evidence that is discovered after an officer mistakenly relies on an invalid law to pull a vehicle over.

In *Illinois v. Krull,* 480 U.S. 340, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987), the Su-

---

**5.** The Tennessee Supreme Court has not squarely confronted the issue of whether the

Memphis ordinance is preempted by the state statute.

preme Court considered the question of whether the exclusionary rule applies to a situation where an officer discovers contraband during the enforcement of an unconstitutional statute. In *Krull,* an Illinois statute regulating the sale of motor vehicles and vehicular parts required businesses to permit examination of their premises so that officers could determine whether the businesses were maintaining proper records. *Krull,* 480 U.S. at 342–43, 107 S.Ct. 1160. An officer visited defendant Krull's place of business and discovered three stolen vehicles and another one that was missing its vehicle identification number. *Id.* at 343, 107 S.Ct. 1160. The day after the search, a federal court in another case ruled that the statute which authorized the search in question was unconstitutional. *Id.* at 343–44, 107 S.Ct. 1160. After analyzing the history and purpose of the exclusionary rule, the Supreme Court noted that the primary function of the rule was to "deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures." *Id.* at 347, 107 S.Ct. 1160 (quoting *United States v. Calandra,* 414 U.S. 338, 347, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974)). The court held that there was no value to attempting to deter police from acting in objectively reasonable reliance on particular statutes later held to be unconstitutional, that the exclusionary rule was not intended to deter legislators from passing unconstitutional laws, and that therefore an exception to the exclusionary rule was appropriate.

Similarly, in this case, in making the traffic stop Detective Valentine relied on an ordinance that appears on its face to be unconstitutional. The constitutional defect in this ordinance is not so glaring as to make an officer's reliance on the law objectively unreasonable.[6] Any officer trained to enforce the Memphis municipal ordinances would rely on the language of the ordinance. Therefore, the fact that Detective Valentine relied on what may be an unconstitutional ordinance does not deprive the stop of probable cause.

**B.** *The Search*

Defendants next argue that even if probable cause existed for the traffic stop, they did not knowingly and voluntarily consent to the search of the van and the evidence should be suppressed on that ground. Although not vigorously argued, they also allude to an illegal detention in the rear of the squad car. The government's response is two-fold: (1) defendants consented to a search of the van, and (2) Detective Valentine had a reasonable suspicion that defendants were transporting cocaine based on his observations after stopping the van which justified further detention of the defendants.

Detective Valentine asked for and obtained consent from both defendants to search the van. He spoke to defendants in both Spanish, their native tongue, and in English. The only question remaining, then, is whether defendants freely and voluntarily consented to the search. For consent to be valid the defendant must have authority to consent and must consent freely and voluntarily. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Whether the consent was freely and voluntarily given "is a question of fact to be determined from all the circumstances," *Bustamonte,* 412 U.S. at 249, 93 S.Ct. 2041, and "must be proven by 'clear and positive' proof." *United States v. Bueno,* 21 F.3d 120, 126 (6th Cir.1994) (quoting *United States v. McCaleb,* 552 F.2d 717, 721 (6th Cir.1977)).

In the present case, both defendants had the authority to consent. The passenger owned the van, and thus had a possessory

**6.** The court notes that if defendants were charged with a violation of the ordinance for having tinted windows, the unconstitutionality of the statute would be an issue relevant to their defense. However, the issue in this motion to suppress hinges on whether probable cause existed for a stop, not whether defendants should be convicted of having windows that were too dark.

interest which enabled him to consent. Similarly, an authorized driver may consent to a search of the vehicle he is driving. Additionally, the court reviewed the videotape of the traffic stop, and it is submitted that the consent was freely and voluntarily given by both defendants. Detective Valentine asked each defendant separately whether he could search their van. Both responded affirmatively. Both defendants appeared to understand the nature of the questions being asked of them; although Detective Valentine's Spanish-speaking ability may not have been perfect, the driver appeared to understand the questions, while the passenger spoke English. The consents were obtained within four minutes of the stop. There is nothing in the record to suggest that Detective Valentine's asking for consent to search unreasonably detained the defendants. Nor is there any indication that defendants objected or questioned the search at any point prior to the search or even after the search had begun. In short, it is submitted that under the totality of the circumstances defendants freely and voluntarily consented to the search of the van.

Finally, as far as the suppression motion is concerned, because no evidence was discovered or statements or consents obtained as a direct result of the detention of defendants in the rear of the squad car, the court need not decide if Detective Valentine had developed a reasonable articulable suspicion of criminal activity to justify their detention.[7]

---

7. The court finds, however, Detective Valentine's testimony concerning smelling cocaine is unbelievable for several reasons. First, Detective Valentine's description of the odor of the cocaine evolved over time, from smelling like "acetone" during the initial detention hearing in this case to an "acidic smell" by the time the suppression hearing was held. While Detective Valentine claimed during the hearing that he always thought acetone (fingernail polish remover) was the same as an acidic smell, his demeanor on the stand was such that the court doubts the veracity of his

### III. RECOMMENDATION

It is submitted that Detective Valentine had probable cause to stop defendants' van and that defendants consented to a search of the van. It is therefore recommended that defendants' motions to suppress be denied.

Aug. 21, 2000.

claim. Additionally, by his own admission, the cocaine that was eventually found was wrapped in fifteen separate packages, stored in a metal compartment welded to the undercarriage of the van with no direct opening between the passenger compartment and the drug compartment. Despite this fact, Detective Valentine claims that he did not smell cocaine when he approached the vehicle from the rear, a few feet from the false compartment, but somehow detected the odor from the front of the van after the stop.