Patricia Bell BLAWIS et al., Plaintiffs,

v.

Wesley BOLIN, Secretary of State of State of Arizona, et al., Defendants.

No. Civ. 72–402 Phx.

United States District Court, D. Arizona.

May 8, 1973.

Treon, Warnicke & Dann, by B. Michael Dann; Jay Dushoff, John Hay, Alan M. Kyman, Phoenix, Ariz., W. Edward Morgan, S. Leonard Scheff, and Risner, Wolfe & Raven, Tucson, Ariz., for plaintiffs.

Gary K. Nelson, Atty. Gen. of Ariz., by James G. Bond, Asst. Atty. Gen., Phoenix, Ariz., for defendant.

William Smitherman, U. S. Atty., D. Ariz. by Fred C. Mather, Asst. U. S. Atty., amicus curiae.

<hr />

OPINION AND ORDER

COPPLE, District Judge.

Plaintiffs filed a complaint seeking injunctive and declaratory relief, mandating the Secretary of State of Arizona to certify the candidates and electors for President and Vice President, and the name of the Communist Party U.S. A., on the 1972 general election ballots. The individual plaintiffs Blawis, Mac-Koviak and Renteria are candidates for Presidential Elector and are pledged to vote for plaintiffs Hall and Tyner. Defendant Bolin is the Arizona Secretary of State, and Marston and Turley are the Recorders of Maricopa and Navajo Counties, respectively. There are no facts in dispute. Jurisdiction is predicated on 28 U.S.C. § 1343(3, 4); 42 U. S.C. § 1983 (1970).

A three-judge court was convened, which denied injunctive relief on the ground that the party had obtained insufficient signatures to qualify for the 1972 ballot, and the issue was moot. Due to the allegation of continuing harm in the amended complaint, the case was remanded to this Court, sitting alone, for a determination of the prayer for declaratory relief. See Brockington v. Rhodes, 396 U.S. 41, 43, 90 S.Ct. 206, 208, 24 L.Ed.2d 209 (1969). The case is submitted on plaintiffs' motion for summary judgment, and all the pleadings and briefs filed.

### I. *Facts*

Plaintiffs gathered signatures on petitions to create a new political party within Arizona and in Summer 1972 presented them to the various county recorders for certification of the signatures pursuant to the Arizona election laws.[1] Marston and Turley refused

<hr />

1. Ariz.Rev.Stat.Ann. §§ 16–202 to 16–204 (1956), amended, (Supp. 1972–1973). The petitions must bear the signature of at least two percent of the votes cast for governor at the preceding general election, be so certified by the respective county recorders, be verified by ten electors, and be presented to the Secretary of State between 60 and 90 days preceding the primary election.

to certify the petitions on the authority of Ariz.Rev.Stat.Ann. § 16–206 (Supp. 1972–73), which disenfranchises the Communist Party U.S.A. and its affiliates. The similar federal statute, 50 U.S.C. §§ 841–842 (1970), is also in issue.[2] Subsequently, a petition consisting of all the signatures and the required verifications, including those refused by Marston and Turley, were submitted to Bolin, who refused on July 14 to accept it for the same reason. On July 22 plaintiffs instituted this action, in which they allege continuing irreparable harm beyond the current elections.

Plaintiffs challenge the proscriptions, Ariz.Rev.Stat.Ann. §§ 16–205, 16–206 (Supp.1972–73), and the federal counterpart, 50 U.S.C. §§ 841–842 (1970), on the grounds that they are a bill of attainder, and violate the privileges and immunities clause, the due process clauses of the fifth and fourteenth amendments, the equal protection clause of the fourteenth amendment, and the first amendment freedoms. The state statute is also attacked under the supremacy clause, and the federal statute is attacked as beyond the power of Congress.

## II. *Arizona Election Statutes*

A number of issues briefed and argued related to the method by which the Party and candidates could qualify for placement on the ballot under state law.[3] Many of those issues are moot or are subsumed in the opinion of the three-judge court denying injunctive relief. The central issue remaining is the validity of the proscription statutes, which plaintiffs maintain are a continuing bar—practically and legally—to the creation of their party in this state. The Arizona election statutes will be discussed only as necessary to reaching a decision on that issue.

---

The state early argued that as the party had not qualified for placement on the primary election ballot, neither it nor its candidates could qualify for the general election, under *id.* § 16–601 (Supp. 1972–1973). The Arizona election laws are not always clear as to the interrelationship of different sections, *see* Board of Supervisors v. Harrington, 85 Ariz. 163, 333 P.2d 971 (1959), and this is especially true of the impact on new parties of the various provisions. There is no doubt that section 16–601 is designed for the use of persons without party designation who were thereby unrepresented in the primary election, in order to allow them access to the general ballot. Were the Communist Party to be on the primary ballot, and fail to nominate anyone for a particular office, no person could be placed on the general ballot under the Party's name through this section. Board of Supervisors v. Harrington, *supra;* Ariz.Rev.Stat.Ann. §§ 16–502, 16–503, 16–506 (1956). The Arizona law clearly contemplates that parties and their candidates shall be elected first through the primary system, but that doors are left open for single individuals to qualify as nonpartisan candidates. This conforms to the apparent intent of the constitutional drafters. Ariz.Const. art. VII, § 10. *But see* Ariz.Rev.Stat.Ann. § 16–601(A) (Supp. 1972–73): "Candidates . . .

may be nominated otherwise than by primary election *or by party committee* in the manner set forth in this section." (Emphasis added.) The committee procedure referred to is probably limited to that for withdrawal of candidates after the primary election. *See Id.* § 16–604. Whatever the merits of this challenge to plaintiffs' standing by the state, which had prevented in the first place the Party's appearance on the primary ballot, the issue is foreclosed by the opinion of the three-judge court.

2. The complaint challenges the federal statute in the event the state statute is found void under the supremacy clause, or the state otherwise relies on it. The state stipulated that the federal statute is in issue, and therefore relies on it.

3. See note 1 *supra*. Total votes cast for governor in 1970 were 411,409. The parties stipulated that 8200 signatures were required. As Arizona now elects its governor to a four-year term, Ariz.Const. art. V, § 1, the relevant figure presumably is that from the last election at which a governor was elected. *Cf.* State *ex rel.* Nelson v. Jordan, 104 Ariz. 193, 450 P.2d 383, *appeal dismissed*, 396 U.S. 5, 90 S.Ct. 24, 24 L.Ed.2d 4 (1969).

A political party may qualify for a ballot position in Arizona only by having previously been on the ballot and having obtained five percent of the votes cast for the various offices for which it ran candidates, Ariz.Rev.Stat.Ann. § 16–201 (1956), or by filing a new-party petition with the Arizona Secretary of State. There is no provision for candidates of new parties to qualify for the ballot. See *id.* §§ 16–301, 16–303, 16–305 (Supp.1972–73). Other gaps in the statutory scheme exist. The plan for enfranchising new parties and their candidates is sufficiently incomplete that the Court could not safely adapt other sections to fill those gaps, even if it were inclined to indulge in legislating a solution.

■ The plaintiff candidates for presidential elector allege they have been nominated "in convention or committee duly convened or held," and intend to run in future elections. The Court finds that the method of selection of these candidates does not contravene the Arizona selection procedure for new-party candidates, and that they have standing to sue. See note 1 *supra.* The impediment to organizing a party that the statutory bar creates, and the practical impossibility of challenging the statute within the 30-day period allowed biennially has not been seriously rebutted by the state. The latter difficulty makes

this case one of recurring harm yet possibly evading review, and therefore appropriate for declaratory relief.

### III. *Statutory History*

The Arizona statutes challenged, Ariz.Rev.Stat.Ann. §§ 16–205, 16–206 (Supp.1972–73), are part of the Arizona Communist Control Act, ch. 108, [1961] Ariz.Sess.Laws 220, a portion of which has been held unconstitutional.[4] Elfbrandt v. Russell, 384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966), *rev'g* 94 Ariz. 1, 381 P.2d 554 (1963), *noted,* 5 Ariz.L.Rev. 254 (1964). Subsection 16–205(B) of the Arizona Act is drawn verbatim from 50 U.S.C. § 841 (1970); other subsections are drawn from other congressional acts, or are newly written. Section 16–206 of the Arizona Act is an almost verbatim adoption of 50 U.S.C. § 842 (1970) (outlawing Communist Party) which in turn is part of a federal series of enactments aimed at suppression of communist political organizations. Communist Control Act of 1954, ch. 886, 68 Stat. 775 (codified at 50 U.S.C. §§ 841–844 and amending other sections of Title 50); Internal Security Act of 1950, ch. 1024, 64 Stat. 987, amended, Pub.L. No. 90–237, 81 Stat. 765 (1968), Pub.L. No. 87–474, 76 Stat. 91 (1962) (codified at 50 U.S.C. §§ 781–798, 811–826, and scattered sections of Titles 8, 18 and 22 U.S.C.); Smith Act, 18 U.S.C. § 2385. Substantial portions of those acts are no longer in force.[5]

---

4. *Elfbrandt* struck down the public employees' loyalty oath, Ariz.Rev.Stat.Ann. § 38–231(E) (Supp. 1972). The act also forbids members of the Party to hold political office. *Id.* §§ 13–707(C), 13–707.01 (Supp. 1972–73). That provision has not been brought into this case. *See* Socialist Workers Party v. Martin, 345 F.Supp. 1132 (S.D.Tex.1972).

5. Congress repealed 50 U.S.C. §§ 811–826 in 1971. Pub.L. No. 92–128, § 2(a), 85 Stat. 348 (1971). Other sections have been found unconstitutional. United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967) (50 U.S.C. § 784(a)(1)(D), prohibiting members of the Party from employment at a defense facility); United States v. Brown, 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484

(1965) (29 U.S.C. § 504, prohibiting members from holding office in a labor union); Aptheker v. Secretary of State, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed. 2d 992 (1964) (50 U.S.C. § 785, prohibiting members from obtaining passports); *see* Communist Party U.S.A. v. Catherwood, 367 U.S. 389, 81 S.Ct. 1465, 6 L.Ed.2d 919 (1961), *rev'g In re* Albertson, 8 N.Y.2d 77, 202 N.Y.S.2d 5, 168 N.E.2d 242 (1960) (50 U.S.C. §§ 841–844 held not to prohibit benefits of state unemployment laws). *But see* Communist Party U.S.A. v. Subversive Act. Cont. Bd. (SACB), 367 U.S. 1, 81 S.Ct. 1357, 6 L. Ed.2d 625 (1961) (registration procedures, 50 U.S.C. §§ 781–783, 786–788, held not a bill of attainder). *See also id.* at 84 & nn. 30–32, 81 S.Ct. at 1404 & nn. 30–32.

While the federal version of the proscription statute has been considered before, Communist Party U. S. A. v. Catherwood, 367 U.S. 389, 81 S.Ct. 1465, 6 L.Ed.2d 919 (1961), the central issue presented here appears to have arisen in only one other case. In Mitchell v. Donovan, 290 F.Supp. 642 (D.Minn.1968), the court granted an injunction under facts identical to those here, but did so on a balancing of the hardships due to the extreme proximity of the election. The merits were not reached. A later attempt to raise the merits failed for mootness. Mitchell v. Donovan, 300 F. Supp. 1145 (D.Minn.1969), *vacated*, 398 U.S. 427, 90 S.Ct. 1763, 26 L.Ed.2d 378 (1970), *dismissed on remand*, No. 3–68–Civ–256 (D.Minn. Jul. 28, 1970). The court did indicate its "grave doubts" as to the constitutionality of the statute, however. 290 F.Supp. at 645.

As was done in *Mitchell*, the Court has invited the United States to submit a brief on its position. Emphasizing that the Department of Justice believes 50 U.S.C. § 842 inapplicable to the case, and that it appears as amicus curiae only, the government submitted the same brief it prepared for the *Mitchell* court and declined to participate further. A reading of that brief leaves one with the unavoidable conclusion that the Department of Justice, itself, entertains serious doubts on a number of grounds as to the constitutionality of section 3 of the Federal Communist Control Act of 1954 if applied as in this case.

## IV. *Attainder*

▆ Plaintiffs' first argument is that the statutes are an attainder. Bills of Attainder are prohibited by Const. art. I, § 9. These legislative acts are bills of attainder if they are "aimed particularly at the Communist Party as an identifiable entity, intending to punish it." Communist Party U. S. A. v. Subversive Act. Cont. Bd. (SACB), 367 U.S. 1, 82,

81 S.Ct. 1357, 1403, 6 L.Ed.2d 625 (1961). In that case, the Supreme Court examined the Internal Security Act, 50 U.S.C. § 781 et seq. (1970), to determine whether it was subject to constitutional attack. The crucial difference between that statute and the two Communist Control Acts is that the former does not designate the Communist Party by name, but instead provides a procedure for identifying organizations as "communist-action" bodies, and requires their registration and certain other consequences.[6] The Control Acts, on the other hand, have as their stated purpose the proscription of the Party from the political process. 50 U.S.C. § 842; Ariz.Rev.Stat.Ann. § 16–206 (Supp.1972–73). While findings are made by the legislature, *id.* § 16–205, they are in conclusory terms as to the particular organization, not as to the general danger to be protected against.

The Arizona Attorney General attempts to meet this challenge by positing that such an enactment is not an attainder where based on lengthy and detailed congressional fact-finding. He misunderstands Communist Party U. S. A. v. SACB, *supra*, upon which he relies for this argument, and the statute it interprets. The court did not there sanction a "legislative finding of guilt." Rather, it held the statute constitutional precisely because any findings under it were made by an administrative quasi-judicial body whose determination was appealable to the courts. The state's argument "ignores the crucial constitutional significance of what Congress did when it rejected [in the Internal Security Act] the approach of outlawing the Party by name and accepted instead a statutory program regulating not enumerated organizations but designated activities." 367 U.S. at 84–85, 81 S.Ct. at 1404. Congress proscribed entities found under stated criteria to be "communist action organizations." It did not

---

6. A detailed analysis of the effect of the Internal Security Act may be found at Communist Party U.S.A. v. Subversive Act. Cont. Bd., 367 U.S. 1, 15–19, 81 S.Ct. 1357, 1368–1370, 6 L.Ed.2d 625 (1961).

proscribe named entities. Defendants defeat their very argument by a quotation from United States v. Brown, 381 U.S. 437, 461, 85 S.Ct. 1707, 1722, 14 L. Ed.2d 484 (1965): "Under our Constitution, Congress possesses full legislative authority, but the task of adjudication must be left to other tribunals." The court there held 29 U.S.C. § 504, prohibiting members of the Party from holding office in a labor union, unconstitutional because it was a bill of attainder. See note 5 *supra*.

It is true that "only the clearest proof could suffice to establish the unconstitutionality of a statute on [this] ground." Flemming v. Nestor, 363 U.S. 603, 617, 80 S.Ct. 1367, 1376, 4 L.Ed.2d 1435 (1960). That proof is found in the plain words of the statute: "The Communist Party . . . shall not be entitled to any of the privileges, rights or immunities attendant upon legal political bodies . . . ." Ariz.Rev.Stat.Ann. § 16–206 (Supp.1972–73). Fundamental political rights of a stated class are terminated; this interest is not comparable to the rational-basis cases cited by defendants.[7] The suggestion that the elimination without recourse of these rights is not punishment, but is regulatory, is frivolous. There is no attempt here to regulate political activity based on adjudication in an appropriate forum. *See* Groppi v. Leslie, 404 U.S. 496, 92 S.Ct. 582, 30 L.Ed.2d 632 (1972). The statute is a punishment of a named group upon a legislative finding of guilt. United States v. Brown, *supra*; Aptheker v. Secretary of State, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964); United States v. Lovett, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946); Cummings v. Missouri, 71 U.S. (4 Wall.) 277, 18 L.Ed. 356 (1867).

The legislature may make findings and pass legislation to correct the ills and dangers it discovers. The respective sections outlawing the Party, however, must fall as bills of attainder, for "whatever the source from which the legislative experience and instruction derived, the Act [must apply] to a class of activity only, not to the Communist Party as such." Communist Party U. S. A. v. SACB, *supra*, 367 U.S. at 88, 81 S.Ct. at 1406.

## V. *Due Process*

 Plaintiffs challenge the statutes as denying the Party due process under the fifth and fourteenth amendments. Defendants contend that the individual plaintiffs are not harmed in any constitutionally cognizable way by the disenfranchisement, and the Party, as an unincorporated association, has no due process rights that are infringed by the statutes. The argument is made by analogy from corporation cases. There is no doubt that "a corporation is a 'person' within the meaning of the equal protection and due process clauses."[8] Grosjean v. American Press Co., 297 U. S. 233, 244, 56 S.Ct. 444, 446, 80 L.Ed. 660 (1936) (protectable due process and first amendment rights invaded by tax). Weighing the rights of an association often depends on the impact of the complained conduct on its members, however. E. g., Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). There the court denied standing to sue in the absence of a showing that the organization or its members would be harmed by the contested action. So too, constitutional guarantees ordinarily unavailable to an organization because they are "personal" rights may be invoked by it where fundamental rights of its members are involved. Communist Party U. S. A. v. United States, 127 U.S.App.D.C. 389, 384 F.2d

---

7. See the equal protection discussion, *infra*.

8. Corporations do not of course have all the rights of individuals. Paul v. Virginia, 75 U.S. (8 Wall.) 168, 19 L.Ed.

357 (1868) (privileges and immunities clause); Hyster Co. v. United States, 338 F.2d 183 (9th Cir. 1964) (self-incrimination clause).

957 (1967).[9] This is not to say that the Party has no due process rights *qua* Party in this case. To suggest that the disenfranchisement of the Party does not effectively destroy the purpose of its existence and therefore raise a protectable right of the Party is to ignore the clear meaning of the due process clause. Regulation of organizations may only be done by reasonable means. *See* Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934); *cf.* Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed. 2d 649 (1965); Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931).

The due process clause of course governs any infringement of the individual plaintiffs' rights under the first, fifth and fourteenth amendments in their effort to form a political party. The statutes violate the due process clause for the same reasons they are a bill of attainder. Healy v. James, *supra*; Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); *see* NAACP v. Alabama *ex rel.* Patterson, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958).

## VI. *Equal Protection and the First Amendment*

This Court has previously observed that equal protection standards enunciated in the current cases are not designed to lend a sense of permanence to district court decisions. Compare San Antonio Ind. School Dist. v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L. Ed.2d 16 (1973) (Powell, J., for the Court), with Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971) (The Chief Justice for the Court). Compare also Rosario v. Rockefeller, 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973); Marston v. Lewis, 410 U.S. 679, 93 S.Ct. 1211, 35 L.Ed.2d 627 (1973); with Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). See generally San Antonio Ind. School Dist. v. Rodriguez, *supra*, 411 U. S. at 70, 93 S.Ct. at 1315–1348 (Marshall, J., dissenting); Gunther, In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv.L.Rev. 1 (1972); Note, The Public School Financing Cases: Interdistrict Inequalities and Wealth Discrimination, 14 Ariz.L.Rev. 88, 105–113 (1972). Suffice it to say that the franchise is a sufficiently fundamental right [10] to require that the state show a

---

9. The court there reversed the conviction of the Party, *qua* Party, for failing to register and to file its organizational statements, as a violation of its officers' and members' fifth amendment privilege against self-incrimination. The dictum to the contrary in Communist Party U.S.A. v. SACB, *supra*, on this point had already been overruled in Albertson v. SACB, 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965), which invalidated on the same ground orders of the Board requiring registration of individual Party members. Thus the registration portions of the Internal Security Act (Subversive Activities Control Act) were finally rendered useless, adding another chapter to a long line of cases invalidating anticommunist measures on constitutional grounds. *See* Communist Party U.S.A. v. United States, *supra*, 384 F.2d at 959 n.3; note 5 supra.

10. Since the enunciation of this standard, it has become commonplace to assert in every lawsuit seeking to strike down a state law that a fundamental right is involved. It may be that what is required is one test which balances on a sliding scale the depth of the state interest against the extent to which the circle of rights around an individual is invaded. *See* San Antonio Ind. School Dist. v. Rodriguez, *supra*, (Marshall, J., dissenting); *cf.* Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 1013, 31 L.Ed.2d 274 (1972) (Burger, C. J., dissenting). *See also* Williams v. Rhodes, 393 U.S. 23, 42–48, 89 S.Ct. 5, 16–19, 21 L.Ed.2d 24 (1968) (Harlan, J., concurring).

Nevertheless, there can be no doubt that the rights involved here are fundamental. "In the present situation the state laws place burdens on two different, although overlapping, kinds of rights—the rights of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. Both of these rights, of course, rank among our most precious

compelling interest in curtailing it. San Antonio Ind. School Dist. v. Rodriguez, *supra,* 411 U.S. at 59, 93 S.Ct. at 1310 n.2 (Stewart, J., concurring). It may be assumed that the protection of the government from violent overthrow is such an interest. But see Pennsylvania v. Nelson, 350 U.S. 497, 76 S.Ct. 477, 100 L.Ed. 640 (1956). The issue is thus joined, and the test is to see whether the least drastic means to accomplish that purpose have been used.[11] Defendants do not meet this argument squarely. Rather, their argument is aimed at the rational basis standard and, having shown a compelling interest, they rest the case.

Eliminating the association for political purposes of an entire group of people is an action surpassing even that in Williams v. Rhodes, *supra,* where access to the ballot by an organization was merely proscribed by unconstitutional requirements. The reliance on previous legislative findings to show that its action is not too broad is useless, as indicated in the attainder section, *supra.* The state might attempt to rely upon the findings of the SACB, but that would seem to fail for two reasons. First, those findings are now very old and there is no assurance that they remain true. *See* American Comm. for Prot. of Foreign Born v. SACB, 380 U.S. 503, 85 S.Ct. 1148, 14 L.Ed.2d 39 (1965); Veterans of Abraham Lincoln Brigade v. SACB, 380 U.S. 513, 85 S.Ct. 1153, 14 L.Ed.2d 46 (1965). Second, the orders of the Board have not yet been validated, over

10 years after the Supreme Court upheld the findings. Communist Party U. S. A. v. United States, *supra*; Albertson v. SACB, *supra.*

Moreover, there are less drastic alternatives to outlawry. The conspiracy and individual advocacy prohibitions have been upheld (over strong dissents), furnishing a method of attacking directly the feared conduct. Scales v. United States, 367 U.S. 203, 81 S.Ct. 1469, 6 L. Ed.2d 782 (1961); Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L. Ed. 1137 (1951). Even those sanctions "border so closely upon constitutionally protected rights" as to place a heavy burden on the government. Scales v. United States, *supra,* 367 U.S. at 230, 81 S.Ct. at 1487; *see* Yates v. United States, 354 U.S. 298, 77 S.Ct. 1064, 1 L. Ed.2d 1356 (1957). In infringing the fundamental political rights of plaintiffs, the state has failed to use the least drastic means to enforce its compelling interest,[12] and has denied equal protection of the laws to plaintiffs.

## VII. *The Federal Statute*

The United States argues that the federal statute, 50 U.S.C. §§ 841–842, may not control the present case because it does not purport to disenfranchise the individual plaintiffs, nor need it necessarily prevent their names appearing on the ballot under some such designation as "communist." *See* Mitchell v. Donovan, *supra,* 290 F.Supp. at 644–645. Not only is it doubtful that those arguments, based on Minnesota

---

freedoms. . . . Similarly we have said with reference to the right to vote: 'No right is more precious in a free country. . . . Other rights, even the most basic, are illusory if the right to vote is undermined.'" Williams v. Rhodes, *supra,* at 30–31, 89 S.Ct. at 10, quoting Wesberry v. Sanders, 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964).

11. Some have suggested that the plaintiff must allege both a fundamental right and a suspect category to bring the doctrine into play. *See* Note, *supra,* 14 Ariz.L. Rev. at 110. Clearly only one or the other

is required. San Antonio Ind. School Dist. v. Rodriguez, *supra,* 411 U.S. at 17, 93 S.Ct. at 1288; Shapiro v. Thompson, 394 U.S. 618, 658, 89 S.Ct. 1322, 1344, 22 L.Ed.2d 600 (1969) (Harlan, J., dissenting).

12. Even if a registration procedure based on fact-finding were used as a prerequisite, it might not meet the test. That question is not analyzed here, but considering the nature of the political process and the need for fluidity, perhaps criminal convictions for direct advocacy are in all cases the superior means to outlawry.

election law, are apt under Arizona law, but they are based on the proposition that the Court should hesitate to construe the statute so as to require resolution of its constitutional impact. *See* Communist Party U. S. A. v. Catherwood, *supra,* 367 U.S. at 394, 81 S.Ct. at 1469. This case is not *Catherwood;* the validity of the federal statute is squarely in issue.

Because of the resolution of the other challenges, it is unnecessary to consider the cross-arguments that the Arizona statute is void under the supremacy clause, *see* Pennsylvania v. Nelson, *supra,* or that the federal statute is beyond the power of Congress, *see* McPherson v. Blacker, 146 U.S. 1, 13 S.Ct. 3, 36 L.Ed. 869 (1902). See note 2 *supra.*

## VIII. *Conclusion*

This is an area which lends itself too easily to conclusory, if not emotional statements. Moreover, the extent to which political activity may be circumscribed under the relevant tests may depend to some degree on one's philosophy of the fragility of the democratic process. There cannot be much doubt, however, that the tests will not support a statute of the type now before the Court. To peremptorily eliminate a large group of minority voters and their party from the political scene not only sweeps too broadly as a protection against subversion, but it also sets up in the current law constitutional conflicts not otherwise present. "Congress's very success with its direct assault upon the Communist Party through the sterner medium of the criminal law could only have had the effect of undermining the constitutional foundations of its disclosure approach. . . . If Congress would do the one, it may have to forego the other." Communist Party U. S. A. v. United States, *supra,* 384 F.2d at 961–962.

Finally, in the absence of a showing that these people, forming this party in Arizona or the United States, are guilty of the forbidden advocacy, the statutes are merely the suppression of a hated minority. "All political ideas cannot and should not be channeled into the programs of our two major parties. History has amply proved the virtue of political activity by minority, dissident groups, who innumerable times have been in the vanguard of democratic thought and whose programs were ultimately accepted. . . . The absence of such voices would be a symptom of grave illness in our society." Sweezy v. New Hampshire ex rel. Wyman, 354 U.S. 234, 250–251, 77 S.Ct. 1203, 1212, 1 L. Ed.2d 1311 (1957). It should not be forgotten that the "radical trade-unionists" of our earlier history did not "overthrow the free enterprise system," but are now charged in some quarters with being staunch members of its Establishment.

The right to participation in the political process through groups of their own choosing cannot be proscribed or limited without some semblance of due process. The challenged statutes, as bills of attainder, do not meet this criterion. Furthermore, adjudicatory procedures reaching this result may still be such a broad invasion of the protected rights as to violate due process or equal protection. So long as the government has available criminal sanctions, it does not appear to require more drastic measures.

Ariz.Rev.Stat.Ann. §§ 16–205, 16–206 (Supp.1972–73), and 50 U.S.C. §§ 841–842 (1970), are unconstitutional on their face and as applied.

It is ordered that plaintiffs' motion for summary judgment is granted as to non-injunctive relief, and counsel shall submit a form of judgment for approval by the Court.