HORTON, J.,
specially concurring in part and dissenting in part.
I join in the result reached in Parts III.A and III.D of the Court’s opinion, although for different reasons than the majority. I join in *428 the Court’s opinion as to Parts III.B and IILC.i. I respectfully dissent from Part III. C.ii of the Court’s opinion.
I. Part III.A — The Reviewability of Manzanares’ Challenges to the Firearm Charge
I join in the Court’s decision that we may not reach Manzanares’ challenges to the Firearm Charge. I do so because the issues advanced on appeal relating to the Firearm Charge were not preserved for appeal. The written plea agreement which identifies the issue or issues preserved for appeal states: “The Defendant reserves the right to appeal to the Idaho Supreme Court the issue of the constitutionality of the charge and statute, and such other matters that might appear in the record of this action.” In my view, the use of the singular “the charge” is inconsistent with the reservation to appeal “such other matters that might appear in the record,” creating ambiguity as to the scope of matters which were preserved for appeal.
The majority correctly notes that State v. Hosey, 134 Idaho 883, 886, 11 P.3d 1101, 1104 (2000), holds that interpretation of the terms of an ambiguous plea agreement involves questions of fact. I believe that Manzanares’ attorney’s explanation of the term at the time of the entry of her plea resolves the ambiguity. He stated: “The part of the plea agreement that I suppose is most critical at this point is the fact that my client reserves the right to appeal the matter to the Supreme Court testing the statute under which she’s pleading guilty this morning.” Thus, it is clear to me that Manzanares’ conditional plea of guilty only served to preserve her constitutional challenge to the Recruiting Provision. Although I question the wisdom of a conditional plea of guilty that does not take into account the possibility of success on appeal (with the consequent probability of a second appeal), I may not substitute my view of what may have been desirable for the parties’ express agreement. Given that counsel’s explanation clearly reflected the understanding that Manzanares would be permitted to challenge the charge to which she pleaded guilty, I concur with the Court’s determination that it is inappropriate to address her challenges to the Firearm Charge.
II. Part Ill.C.ii — The Constitutionality of the Recruiting Provision
I respectfully dissent from the Court’s conclusion that the Recruiting Provision is not facially overbroad.
A. Structure of the ICGEA
I start first with consideration of the Court’s description of the operation of the ICGEA. I do so because I believe that the Court’s description, although resulting in a construction which avoids the necessity of declaring the statute unconstitutional, is not found within the language of the act and is inconsistent with the evident intent of the Legislature.
After discussing the Recruiting Provision and three statutory definitions, the Court concludes:
Thus, putting these pieces together, after the State proves the existence of a criminal gang ..., the State must prove that the defendant (1) knew of the criminal gang and (2) knowingly solicited, invited, encouraged, or otherwise caused someone to “actively participate in” either (a) the criminal gang’s commission of one of the ICGEA’s enumerated offenses or (b) in making it one of the criminal gang’s “primary activities” to commit one or more of the ICGEA’s enumerated crimes.
(Emphasis added). This description of the Recruiting Provision as requiring that the defendant “caused someone” to “actively participate” by either (1) committing one of the ICGEA’s enumerated offenses or (2) by “making it one of the criminal gang’s ‘primary activities’ to commit one or more” of those offenses is critical to the Court’s holding in this case. Indeed, when concluding that the Recruiting Provision passes constitutional muster, the Court states:
In focusing on the lack of a specific intent requirement, Manzanares simply overlooks what the Recruiting Provision does require the State to prove: that the defendant knew of the existence of the criminal gang and that the defendant *429 knowingly solicited, invited, encouraged or otherwise caused a person to actively participate in either the criminal gang’s commission of one of the ICGEA’s enumerated offenses or in making the commission of one of those crimes one of the primary activities of the criminal gang. While knowledge is a different mens rea than specific intent, we find that the Recruiting Provision is sufficiently narrow to avoid implicating a substantial amount of protected conduct.
Merely soliciting, inviting, encouraging or otherwise causing a person to be a member of an organization or to associate or interact with that organization, even where that organization qualifies as a criminal gang under the ICGEA, does not necessarily amount to soliciting, inviting, encouraging or otherwise causing that person to “actively participate in a criminal gang” under the Recruiting Provision_How-ever, where a defendant knowingly invites a person to somehow promote, further or assist in the commission of the ICGEA’s enumerated offenses by any member of the criminal gang, then the defendant has invited a person to actively participate in the criminal gang.
Unlike the majority, I am unable to discern the link between the phrase “actively participate” and criminal activity in the statutory scheme.
Idaho Code § 18-8504(1)[7] provides, in pertinent part, that “[a] person commits the offense of recruiting criminal gang members by: (a) Knowingly soliciting, inviting, encouraging or otherwise causing a person to actively participate in a criminal gang.” Significantly, the statute does not require that the accused cause another to become a “criminal gang member.” This phrase has a specific statutory definition,[8] specifying that in order to be a “criminal gang member,” one must engage in “a pattern of criminal gang activity” in addition to meeting certain other criteria. A “pattern of criminal gang activity” is defined by I.C. § 18-8502(3)[9] as “the com *430 mission, attempted commission or solicitation of two (2) or more of [twenty-one specified predicate] offenses, provided that the offenses are committed on separate occasions or by two (2) or more gang members.” Thus, a prerequisite to being a “criminal gang member” is the solicitation, attempted commission, or commission of two or more of the crimes listed in I.C. § 18-8502(3) (“predicate offenses”).
The majority evidently shares my view that the Recruiting Provision does not require that the accused cause another (the “recruit”) to become a criminal gang member. Rather, the majority describes the Recruiting Provision as requiring that the recruit “actively participate” in either: (1) the criminal gang’s commission of a predicate offense; or (2) making commission of a predicate offense one of the criminal gang’s “primary activities.” However, the statutory definition of “criminal gang” does not provide for such a narrow construction of the Recruiting Provision. Idaho Code § 18-8502(1) defines a “criminal gang” as:
... an ongoing organization, association, or group of three (3) or more persons, whether formal or informal, that has a common name or common identifying sign or symbol, whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity, having as one (1) of its primary activities the commission of one (1) or more of the criminal acts enumerated in subsection (3) of this section.
Parsing this definition, a criminal gang is: (1) an ongoing organization, association, or group of three or more persons, whether formal or informal, (2) that has a common name or common identifying sign or symbol, (3) whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity, (4) having as one of its primary activities the commission of one or more predicate offenses.
Presumably, the fourth clause is intended to distinguish a criminal gang from noncriminal associations of three or more persons that have a common name or common identifying sign. If this were not the case, any service organization (e.g., Rotary), religious organization, public institution (including those whose members identify themselves as senators, representatives, commissioners, judges, etc.), or any other association with an identifiable membership could be characterized as a “criminal gang” if a member or members of that association “individually or collectively engage in or have engaged in a pattern of criminal gang activity.”
The importance of the fourth clause cannot be gainsaid. I think that the implications of its absence are perhaps best demonstrated by way of an example. Rotary International is an organization comprised of 1.2 million members in more than 34,000 clubs worldwide. Identifying themselves as “Rotarians,” they “provide humanitarian service, encourage high ethical standards in all vocations, and help build goodwill and peace in the world.”[10] In the absence of the fourth clause, if a single Rotarían committed two acts of assault on different occasions (assault is a predicate offense under I.C. § 18-8502(3)(g)), Rotary International would properly be characterized as a “criminal gang” and, by operation of the Recruiting Provision, one would commit a felony by soliciting another to “actively participate” in the work of Rotary International.
Thus, I turn my attention to the language of the fourth clause, i.e., “having as one (1) of *431 its primary activities the commission of one (1) or more of the criminal acts enumerated in [I.C. § 18-8502(3) ].” The indefinite possessive pronoun “its” evidently refers to the association. Two difficulties with this fourth clause present themselves to me.
The first difficulty that I confront is this: regardless of the noun considered, whether it be “organization,” “association,” or “group,” the noun identifies a relationship between individuals, while “primary activities” relates to the joint or individual actions of one more members sharing that common relationship. This is significant because the concept of relationship is abstract; whereas the commission, attempted commission or solicitation of criminal acts is not. Stated differently, an association does not act.[11] Rather, the members of an association act, whether individually or in concert. The definition of criminal gang is notable because it does not require that each person sharing the relationship also share a common objective of engaging in, or encouraging commission of, predicate offenses.
Equally significantly, the ICGEA does not require that the commission of one or more predicate offenses be the primary activity of the association. Rather, the Act merely requires that such criminal conduct be only one of the association’s primary activities. Used in this sense, “primary” does not have its most common meaning of “first in importance.” Webster’s New World Dictionary 1129 (2d college ed.1976). Rather, it has the secondary meaning of “chief; principal; main [a primary concern].” Id. Thus under the ICGEA, an association that engages in multi-pie primary activities, many of which are non-criminal, is a criminal gang if just one of those primary activities is the commission of predicate offenses. Under the statutory definition, then, one may “actively participate” in a criminal gang — even in a “primary activity” of that gang — without sharing a common criminal objective and without criminal intent. Since the Recruiting Provision, I.C. § 18-8504(1), merely requires that one knowingly cause “a person to actively participate in a criminal gang,” I am unable to agree with the majority’s conclusion that the Recruiting Provision requires that the recruit “ ‘actively participate in’ either (a) the criminal gang’s commission of one of the ICGEA’s enumerated offenses or (b) in making it one of the criminal gang’s “primary activities” to commit one or more of the ICGEA’s enumerated crimes.” I am not alone in this view. At oral argument, in response to a hypothetical question, the Deputy Attorney General representing the State expressed his belief that the Recruiting Provision could properly be interpreted as prohibiting the recruiting of an interior decorator into gang membership, even if the role of that recruit was limited to “actively participating” in the gang by designing a more attractive clubhouse where the gang members might socialize. Further, the State’s sweeping view of the scope of the Recruiting Provision is well-grounded in legislative history.
Based upon common language found in the two acts, it is evident that the ICGEA was derived, in large part, from California’s Street Terrorism Enforcement and Preven *432 tion Act (STEP). STEP’S recruiting provision states:
(a) Any person who solicits or recruits another to actively participate in a criminal street gang, as defined in subdivision (f) of Section 186.22, with the intent that the person solicited or recruited participate in a pattern of criminal street gang activity, as defined in subdivision (e) of Section 186.22, or with the intent that the person solicited or recruited promote, further, or assist in any felonious conduct by members of the ei’iminal street gang, shall be punished by imprisonment in the state prison for 16 months, or two or three years.
Cal.Penal Code § 186.26 (emphasis added). As the emphasized language reflects, STEP expressly provides that a person is guilty of recruiting criminal gang members if he or she did so with the specific intent that the recruit would “participate in a pattern of criminal street gang activity” or that the recruit would “promote, further, or assist in any felonious conduct by members” of the gang. When the Idaho Legislature enacted the ICGEA, its decision to modify the recruiting provision found in the California statute reflected the intent to eliminate the requirement that the defendant possess the specific intent that the recruit would participate in criminal conduct. Brown’s Tie & Lumber Co. v. Chicago Title Co. of Idaho, 115 Idaho 56, 60, 764 P.2d 423, 427 (1988) (significant that legislature omitted statutory language used in other jurisdictions).
Thus, I turn my attention to the First Amendment implications presented by the absence of a requirement that a defendant possess the specific intent that a recruit will engage in criminal conduct.
B. First Amendment Considerations
The United States Supreme Court has repeatedly stated that “freedom of association is itself guaranteed in the First Amendment....” Aptheker v. Sec’y of State, 378 U.S. 500, 507, 84 S.Ct. 1659, 1664, 12 L.Ed.2d 992, 998 (1964) (citations omitted); see also Healy v. James, 408 U.S. 169, 181, 92 S.Ct. 2338, 2346, 33 L.Ed.2d 266, 279 (1972); Elfbrandt v. Russell, 384 U.S. 11, 17, 86 S.Ct. 1238, 1241, 16 L.Ed.2d 321, 325 (1966); Gibson v. Fla. Legis. Investigation Comm., 372 U.S. 539, 543, 83 S.Ct. 889, 892, 9 L.Ed.2d 929, 933-34 (1963). The Fourteenth Amendment prohibits the states from abridging the freedoms guaranteed by the First Amendment.[12] Cramp v. Bd. of Public Instruction of Orange Cnty., Fla., 368 U.S. 278, 285, 82 S.Ct. 275, 279-80, 7 L.Ed.2d 285, 291 (1961); Cantwell v. State of Conn., 310 U.S. 296, 303, *433 60 S.Ct. 900, 903, 84 L.Ed. 1213, 1217-18 (1940).
This, of course, begs the question: What does “freedom of association” mean? Despite the United States Supreme Court’s description that the right of association “includes the right to express one’s attitudes or philosophies by membership in a group or by affiliation with it or by other lawful means,” Griswold v. Conn., 381 U.S. 479, 483, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510, 514 (1965) (citation omitted), the answer is not entirely clear. The United States Supreme Court did provide instruction in Roberts v. U.S. Jaycees, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), Board of Directors of Rotary International v. Rotary Club of Duarte, 481 U.S. 537, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987), and City of Dallas v. Stanglin, 490 U.S. 19, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989).
In Roberts, the Court assessed the constitutionality of a Minnesota antidiscrimination statute that required a civic organization to make full membership available to women. 468 U.S. at 612, 104 S.Ct. at 3246-47, 82 L.Ed.2d at 467-68. There, the Court defined two lines of precedent:
Our decisions have referred to constitutionally protected “freedom of association” in two distinct senses. In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty. In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment-speech, assembly, petition for the redress of grievances, and the exercise of religion. The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties.
Id. at 617-18, 104 S.Ct. at 3249, 82 L.Ed.2d at 471. The Court continued, observing that “the nature and degree of constitutional protection afforded freedom of association may vary depending on the extent to which one or the other aspect of the constitutionally protected liberty is at stake in a given case.” Id. at 618, 104 S.Ct. at 3249-50, 82 L.Ed.2d at 471.
Describing the first category of cases, the Court continued:
The Court has long recognized that, because the Bill of Rights is designed to secure individual liberty, it must afford the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State. Without precisely identifying every consideration that may underlie this type of constitutional protection, we have noted that certain kinds of personal bonds have played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs; they thereby foster diversity and act as critical buffers between the individual and the power of the State. Moreover, the constitutional shelter afforded such relationships reflects the realization that individuals draw much of their emotional enrichment from close ties with others. Protecting these relationships from unwarranted state interference therefore safeguards the ability independently to define one’s identity that is central to any concept of liberty.
Id. at 618-19, 104 S.Ct. at 3250, 82 L.Ed.2d at 471-72 (citations omitted).
The Court then noted the continuum of relationships existing in society, ranging from intimate family relationships to coworkers employed by a large corporation, observing that the former are entitled to constitutional protection while suggesting that the latter are not. Id. at 619-20, 104 S.Ct. at 3250-51, 82 L.Ed.2d at 472-73. Those relationships clearly entitled to constitutional protections are those possessing the following attributes: “relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship.” Id. at 620, 104 S.Ct. at 3250, 82 *434 L.Ed.2d at 472. Conversely, an association lacking these attributes is not likely to be afforded constitutional protection. Id. In determining whether an association is entitled to protection, the Court then identified the following factors as relevant to a determination whether the relationship is protected by the First Amendment: “size, purpose, policies, selectivity, congeniality, and other characteristics that in a particular case may be pertinent.” Id. Notably, the Court stated that “we have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.” Id. at 622, 104 S.Ct. at 3252, 82 L.Ed.2d at 474.
Applying these factors and noting that gender was the only meaningful restriction on full membership in the U.S. Jaycees, the Court concluded that “Minnesota’s compelling interest in eradicating discrimination against its female citizens justifies the impact that application of the statute to the Jaycees may have on the male members’ associational freedoms.” Id. at 623, 104 S.Ct. at 3253, 82 L.Ed.2d at 475. It is noteworthy that despite the large size and largely impersonal nature of the association, the Court nevertheless focused upon the state’s “compelling interest” in upholding a restriction upon the members’ associational freedoms.
In Rotary Club of Duarte, the Supreme Court again addressed the contours of freedom of association in the context of a statute that required a civic organization to admit females into membership. 481 U.S. at 541-42, 107 S.Ct. at 1943-44, 95 L.Ed.2d at 481-82. The Court followed its earlier approach in Roberts, “considering separately the effect of the challenged state action on individuals’ freedom of private association and their freedom of expressive association.” Id. at 544-45, 107 S.Ct. at 1945, 95 L.Ed.2d at 484.
Noting the size of Rotary clubs in California, the regular turnover in membership, and an emphasis on making the affairs of the clubs open to the public, the Court concluded that a California law requiring that women be admitted did not “interfere unduly with the members’ freedom of private association.” Id. at 547, 107 S.Ct. at 1947, 95 L.Ed.2d at 485. When considering the claim that the statute violated the members’ rights of expressive association, the Court concluded that the “slight infringement on Rotary members’ right of expressive association” by the statute was justified by the state’s “compelling interest in eliminating discrimination against women.” Id. at 549, 107 S.Ct. at 1948, 95 L.Ed.2d at 486.
In Stanglin, the Court addressed an ordinance that precluded those other than 14 to 18 year olds from patronizing certain dance-halls. 490 U.S. at 20-21, 109 S.Ct. at 1592-93, 104 L.Ed.2d at 23. The Court held that “the activity of these dance-hall patrons— coming together to engage in recreational dancing — is not protected by the First Amendment.” Id. at 25, 109 S.Ct. at 1595, 104 L.Ed.2d at-. The Court stated: “It is clear beyond cavil that dance-hall patrons, who may number 1,000 on any given night, are not engaged in the sort of ‘intimate human relationships’ referred to in Roberts.” Id. at 23, 109 S.Ct. at 1594-95, 104 L.Ed.2d at 24. Rather, “[t]he hundreds of teenagers who congregate each night at this particular dance hall are not members of any organized association; they are patrons of the same business establishment.” Id. at 24, 109 S.Ct. at 1595, 104 L.Ed.2d at 25.
The lesson that I draw from these three cases is that First Amendment protections will only be extended to interpersonal relationships founded upon something more than common patronage of a commercial establishment. In the event that there is a relationship founded upon common membership in an organization, even if that organization is large and non-seleetive, the members of that organization possess associational and expressive interests[13] that may be legitimately *435 abridged upon a showing of a compelling state interest.
In view of the foregoing, I would conclude that the definition of criminal gang found in the ICGEA, i.e., an ongoing organization, association, or group of three or more persons, whether formal or informal, sharing a common name or common identifying sign or symbol, and whose members share common activities which may include criminal behavior (whether individually or collectively), implicates the First Amendment freedom of association for associations] or expressive purposes. This leads me to consider whether the statute is overbroad or whether the statute advances a compelling state interest.

1. Overbreadth

The overbreadth doctrine is “strong medicine,” and courts employ it only as a last resort. Broadrick v. Okla., 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830, 841 (1973). If possible, a challenged statute should be given a limiting construction which avoids constitutional infirmity. Id. Where conduct, not speech, is involved, a court may only invalidate a statute if its overbreadth is substantial in relation to the statute’s legitimate scope. Id. at 615, 93 S.Ct. at 2917-18, 37 L.Ed.2d at 841 — 42. “Overbreadth is not substantial if, despite the fact that some constitutionally protected conduct is proscribed, the statute covers a wide range of conduct that is easily identifiable and within the [government’s] power to prohibit.” State v. Doe, 148 Idaho 919, 925, 231 P.3d 1016, 1022 (2010) (quoting State v. Korsen, 138 Idaho 706, 714, 69 P.3d 126, 134 (2003)). Significantly, overbreadth attacks have also been permitted in cases where the United States Supreme Court believed that “rights of association were ensnared in statutes which, by their broad sweep, might result in burdening innocent associations.” Broadrick, 413 U.S. at 612, 93 S.Ct. at 2916, 37 L.Ed.2d at 840. Although laws that tend to restrict the right of individuals to associate must be tailored narrowly to serve legitimate governmental interests, Aptheker, 378 U.S. at 508, 84 S.Ct. at 1664-65, 12 L.Ed.2d at 998-99 (1964); Baggett v. Bullitt, 377 U.S. 360, 372 n. 10, 84 S.Ct. 1316, 1323 n. 10, 12 L.Ed.2d 377, 386 n. 10 (1964), overbreadth claims “have been curtailed when invoked against ordinary criminal laws that are sought to be applied to protected conduct.” Id. at 613, 93 S.Ct. at 2917, 37 L.Ed.2d at 841.
Much of the United States Supreme Court’s jurisprudence exploring the freedom of association developed during the Cold War,[14] when factions of the Communist Party advocated violent overthrow of the federal government. Communist groups were popularly perceived as involving violent and criminal contingents. State and federal laws were enacted which sought to regulate the membership and conduct of these groups, and many of these statutes were challenged on the grounds that they infringed upon the right to freedom of expressive association and imposed guilt by association. In De Jonge v. Oregon, state law criminalized the act of assisting in conducting a Communist Party meeting. 299 U.S. 353, 356-57, 57 S.Ct. 255, 256-57, 81 L.Ed. 278, 279-80 (1937). The Court held the statute unconstitutionally infringed upon the freedoms of speech and assembly, reasoning that because the discussion at a Communist Party meeting may be wholly lawful and never incite imminent violence or crime, the simple fact that a person organized a meeting sponsored by the Communist Party did not amount to illegal conduct. Id. at 364-65, 57 S.Ct. at 259-61, 81 L.Ed. at 283-84. The Court explained that:
The question, if the rights of free speech and peaceable assembly are to be pre *436 served, is not as to the auspices under which the meeting is held but as to its purpose; not as to the relations of the speakers, but whether their utterances transcend the bounds of the freedom of speech which the Constitution protects. If the persons assembling have committed crimes elsewhere, if they have formed or are engaged in a conspiracy against the public peace and order, they may be prosecuted for their conspiracy or other violation of valid laws. But it is a different matter when the State, instead of prosecuting them for such offenses, seizes upon mere participation in a peaceable assembly and a lawful public discussion as the basis for a criminal charge.
Id. at 365, 57 S.Ct. at 260, 81 L.Ed. at 284. The Court held that government may not criminalize association with a group merely because it includes criminal factions. Rather, only if the members associate because they share the purpose of accomplishing a criminal act may their association be criminalized.
Intent to commit a crime was again the determinative factor in Scales v. United States, 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961). In that case, the United States Supreme Court upheld a federal statute that made it a crime to knowingly be a member of an organization which advocated violent overthrow of the government. Id. at 205, 81 S.Ct. at 1473-74, 6 L.Ed.2d at 787-88. Although the statute did not include an express requirement that one’s membership exist with the specific intent to accomplish the group’s goal of violent overthrow, the Court looked to the structure and legislative history of the statute and construed it to include a requirement of specific intent. Id. at 206-19, 81 S.Ct. at 1474-81, 6 L.Ed.2d at 788-96. Addressing the appellant’s facial challenge to the statute under the First Amendment, the Court affirmed that guilt is personal and that “[mjembership, without more, in an organization engaged in illegal advocacy” is insufficient grounds to impose a criminal penalty. Id. at 224-25, 81 S.Ct. at 1484, 6 L.Ed.2d at 798-99. Yet because the Court construed the statute to include a specific intent requirement, the Court held that the scope of the statute’s infringement did not unconstitutionally extend to lawful association. Id. at 225, 81 S.Ct. at 1484, 6 L.Ed.2d at 799. Rather, the Court reasoned that “the member for whom the organization is a vehicle for the advancement of legitimate aims and policies does not fall within the ban of the statute _Such a person may be foolish, deluded, or perhaps merely optimistic, but he is not by this statute made a criminal.” Id. at 229-30, 81 S.Ct. at 1486, 6 L.Ed.2d at 802. The Court refused to impose guilt simply due to one’s mere association with an organization that includes criminal factions.
The United State Supreme Court confirmed that the specific intent to commit a group’s criminal purpose transforms an otherwise lawful association protected from government prohibition into an unlawful association subject to regulation and criminal sanction in Aptheker v. Secretary of State, 378 U.S. 500, 511, 84 S.Ct. 1659, 1666-67, 12 L.Ed.2d 992, 1000 (1964)[15] and United States v. Robel, 389 U.S. 258, 262-63, 88 S.Ct. 419, 422-23, 19 L.Ed.2d 508, 512-14 (1967). In each case, the Court struck as facially overbroad statutory provisions regulating Communist organizations, holding that the provisions lacked the content and legislative history necessary to support judicial constructions that included a specific intent requirement. In Robel, the statute at issue prohibited individuals who professed membership in a Communist organization from obtaining or maintaining employment in any defense facility, and imposed criminal penalties upon those who disobeyed. 389 U.S. at 260, 88 S.Ct. at 421-22, 19 L.Ed.2d at 511-12. The Court determined that, lacking the necessary requirement of specific intent,
[he] statute casts its net across a broad range of associational activities, indiscriminately trapping membership which can be constitutionally punished and membership which cannot be so proscribed. It is made *437 irrelevant to the statute’s operation that an individual may be a passive or inactive member of a designated organization, that he may be unaware of the organization’s unlawful aims, or that he may disagree with those unlawful aims.
Id. at 265-66, 88 S.Ct. at 424-25, 19 L.Ed.2d at 515. Robel and the cases that precede it make clear that legislative curtailments of the freedom of expressive association must be finely tuned to impact only the criminal intent and conduct which the legislative body has the power to proscribe within the bounds of the United States Constitution. As the Supreme Court observed in a case arising from the social unrest of the early 1970s, it “has consistently disapproved governmental action imposing criminal sanctions or denying rights and privileges solely because of a citizen’s association with an unpopular organization.” Healy v. James, 408 U.S. 169, 185-86, 92 S.Ct. 2338, 2348, 33 L.Ed.2d 266, 281-82 (1972).
The State argues that a criminal gang is not a type of association protected by the First Amendment because it is neither an intimate nor expressive association. Other jurisdictions have recognized that criminal gangs are entitled to some degree of freedom of association, and as a consequence have insisted upon the existence of a specific intent requirement in their anti-gang statutes. In Helton v. State, 624 N.E.2d 499, 506 (Ind.Ct.App.1993), a state statute made it a felony to commit criminal gang activity by “knowingly or intentionally actively participating] in a criminal gang,” i.e., a group with at least five members who were required to commit a felony to become a member and who supported or participated in the commission of a felony to remain a member. Consistent with United States Supreme Court precedent, the Indiana court construed the statute to include a requirement that the actor possess the specific intent to further the group’s criminal conduct. Id. at 508. The court recognized that individuals may join a gang for non-criminal purposes, and stated that “the member for whom the criminal gang is an instrument for the advancement of legitimate goals and policies does not fall within the Gang Statute’s ban since he lacks the requisite specified intent to further criminal conduct.” Id. at 511. Since the statute included the specific intent requirement, it did not infringe upon the right to freedom of association. Id. Likewise, a California statute that imposed enhanced criminal sanctions for crimes “committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members” did not violate freedom of association because it included a specific intent requirement. People v. Gardeley, 14 Cal.4th 605, 59 Cal.Rptr.2d 356, 927 P.2d 713, 725 (1996).
At least one court has concluded that a criminal gang is simply not a form of association protected by the First Amendment. State v. Bennett, 150 Ohio App.3d 450, 782 N.E.2d 101 (2002). However, that court did not engage in a thorough freedom of association analysis, instead citing City of Chicago v. Morales, 527 U.S. 41, 53, 119 S.Ct. 1849, 1857, 144 L.Ed.2d 67, 78 (1999), for the proposition that gang members’ social contact is unprotected, and United States v. Choate, 576 F.2d 165, 181 (9th Cir.1978), for the proposition that the right of association does not extend to organizations that commit felonies. This assessment is inadequate. The United States Supreme Court’s statement in Morales that the right of association does not include “social contact between gang members and others” must be understood in the context of the statute there at issue. Morales, 527 U.S. at 53, 119 S.Ct. at 1857, 144 L.Ed.2d at 78. Morales dealt with a statute that prohibited individuals, gang member or not, from loitering in public areas if they had received a relocation request from a peace officer. Id. at 47, 119 S.Ct. at 1853-55, 144 L.Ed.2d at 74. Thus, similar to the unprotected social association in Stanglin, the conduct not entitled to First Amendment protections in Morales was the act of loitering amongst and socializing with both gang members and nonmembers in a public place. Further, the Ohio court’s interpretation of Choate is a stretch, given that the Ninth Circuit there did not hold that the freedom of association does not extend to an organization which exists for many purposes, including the commission of felonies. Rather, the *438 court stated simply that “the practice of associating with compatriots in crime is not a protected associational right ...i.e., that associations formed for the sole purpose of conducting criminal activity are not entitled to First Amendment protections. 576 F.2d at 181. To interpret the Ninth Circuit’s holding otherwise would fly in the face of the Cold War era cases decided by the United States Supreme Court, each of which required that, in order to be made criminal, membership must be accompanied by the specific intent to commit the group’s criminal purpose. Thus, neither Morales nor Choate preclude the conclusion that groups which may be identified as criminal gangs have associational aspects and are therefore entitled to First Amendment protections.
I believe that the ICGEA is unconstitutionally overbroad because some groups that meet the Act’s definition of “criminal gang” may be intimate or expressive associations that are entitled to First Amendment protections. Looking back to the Cold War era, for example, if the ICGEA had been in effect and two or more members of the Communist Party had attempted murder, burglary, or concealment of evidence, the Party would have been a criminal gang under the ICGEA. Under the Act’s Recruiting Provision, recruitment of new members to the Party would have been a criminal act. Yet prosecution under the Recruiting Provision would have been unconstitutional, as the members of the Communist Party collectively engaged in the primary activities of constitutionally protected speech and expressive conduct, such that association with the Communist Party was guarded by the United States Constitution. As U.S. Supreme Court precedent has demonstrated, the First Amendment would not permit government infringements upon all associations with the Communist Party, but rather only those associations formed with the specific intent that they advance or achieve a criminal purpose.
From a more contemporary perspective, the ICGEA definition reaches a group of political activists whose members engage in criminal activity in order to pursue their political objectives, such as extremist environmental and animal rights groups. While the First Amendment permits the government to prosecute the criminal conduct of the members of activist groups’, it precludes one’s prosecution for mere membership in, or association with, such an organization. Prosecution and conviction on such grounds amounts to guilt by association, a concept repeatedly rejected as unconstitutional by the United States Supreme Court.
Since the First Amendment exists to shield minority dissident groups from suppression, statutes that infringe upon minority groups’ expression and association, without limiting such infringements to the conduct not protected by the First Amendment, are substantially overbroad and thus invalid. Further, as the courts in both Scales and Helton acknowledged, statutes that criminalize membership without a specific intent requirement impose punishment upon the member who is “foolish, deluded, or perhaps merely optimistic,” or who joins the group “for the advancement of legitimate goals and policies,” yet who has no criminal purpose. The U.S. Constitution protects such members from criminal punishment.
These are only a few examples of the types of First Amendment protected associations that fit within the ICGEA definition of “criminal gang.” Given that the United States Supreme Court has declined to limit intimate association to purely familial relationships, I believe that intimate groups, formed between friends for purposes of socializing in private, passing on cultural traditions, transmitting shared ideals and beliefs, and investing in the development and exploration of members’ individual identities, are also intimate associations entitled to First Amendment protections. Since a group that does not have an expressive purpose may possess these characteristics, in addition to the characteristics that cause it to fall within the I.C. § 18-8502(1) definition of a criminal gang, groups commonly known as “gangs” may be intimate associations entitled the First Amendment right to freedom of association.
It may be that some groups are formed and maintained for a wholly criminal purpose, and that as applied to those groups, the ICGEA would pose no threat to the individu *439 al rights protected by the Constitution. However, the ICGEA, by its inclusion of the phrase “one of its primary activities,” is not restricted to such associations. The doctrine of overbreadth looks to all conceivable applications of a statute to determine whether the statute is invalid because it infringes on First Amendment freedoms. Since the ICGEA sweeps broadly enough to affect many types of groups that may qualify as intimate or expressive associations, it is substantially overbroad relative to its legitimate aim of proscribing that conduct of “criminal gangs” which is in fact criminal. This conclusion does not prevent the enactment of laws that criminalize gang conduct. Rather, it simply requires that those laws be tailored to prohibit only the criminal conduct they seek to thwart, while avoiding unnecessary infringements upon the constitutional right to freedom of association.
In Elfbrandt v. Russell, 384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966), the Supreme Court specifically noted the situation which I believe is presented by the ICGEA: organizations and associations may have multiple objectives, some legal and others illegal. Id. at 15, 86 S.Ct. at 1240, 16 L.Ed.2d at 324. The Court struck down the statute in question, stating:
Those who join an organization but do not share its unlawful purposes and who do not participate in its unlawful activities surely pose no threat, either as citizens or as public employees. Laws such as this which are not restricted in scope to those who join with the ‘specific intent’ to further illegal action impose, in effect, a conclusive presumption that the member shares the unlawful aims of the organization.
Id. at 17, 86 S.Ct. at 1241, 16 L.Ed.2d at 325.
Based upon the foregoing analysis, I believe that the statute is facially overbroad in light of the Legislature’s decision to eliminate the requirement that a party recruiting [16] another to join a criminal gang do so with the specific intent that the recruit engage in criminal conduct. Rather, the statute permits conviction even where one recruits another to join a gang to advance or achieve perfectly legal objectives.
This leads to the consideration of whether the statute is subject to a saving construction. In the course of determining whether to impose a saving construction, the United States Supreme Court has declined to rewrite a statute to the point of changing its clear purpose. Aptheker, 378 U.S. at 515, 84 S.Ct. at 1668, 12 L.Ed.2d at 1003 (“It must be remembered that ‘[ajlthough this Court will often strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of a statute ...’ or judicially rewriting it.” (quoting Scales, 367 U.S. at 211, 81 S.Ct. at 1477, 6 L.Ed.2d at 791)). Given the Legislature’s decision to eliminate the requirement of specific intent, any saving construction, including the construction advanced by the majority, would be contrary to clear legislative intent. Thus, I do not believe that it can be so saved.

2. Compelling state interest

The State places substantial emphasis on the United States Supreme Court’s holding in Holder v. Humanitarian Law Project, — U.S. -, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010), in which a constitutional challenge was levied against a federal statute that criminalized the provision of material support to foreign terrorists by one who knew either that the group committed terrorist acts or that the group was a federally-designated terrorist group. The statute at issue in Humanitarian Law Project did not criminalize mere membership, but instead prohibited speech in the form of the knowing provision of material support. Id. at-, 130 S.Ct. at 2718, 177 L.Ed.2d at 373. The Court upheld the statute even though it did not include a requirement that the defendant possess the specific intent to further the illegal conduct of the terrorist organization. Id. at-, 130 S.Ct. at 2717, 177 L.Ed.2d at 372-73. *440 Throughout the opinion, the Court framed “the Government’s interest in combating terrorism [a]s an urgent objective of the highest order.” Id. at-, 130 S.Ct. at 2724, 177 L.Ed.2d at 381. In light of the “sensitive and weighty interests of national security and foreign affairs,” the Court afforded substantial deference to the political branches’ assessment of the severity of the dangers caused by the knowing provision of material support to foreign terrorist groups. Id. at -, 130 S.Ct. at 2727, 177 L.Ed.2d at 383-84. The Court concluded that, given the unique circumstances surrounding foreign terrorism, the challenged provisions were justified and the statute was constitutional on the grounds challenged. Id. at-, 130 S.Ct. at 2730-31, 177 L.Ed.2d at 386-87.
The unique facts and narrow holding of Humanitarian Law Project distinguish it from and make it inapplicable to cases in which statutes affect the assoeiational rights of those who engage in expressive association with domestic organizations, and the State’s reliance thereon is therefore misplaced. I do not believe that there is a compelling state interest that justifies the broad sweep of the Recruiting Provision. Although there is a compelling governmental interest in national security, Idaho may advance its legitimate and compelling state interest in prevention of criminal offenses either by imposing a specific intent requirement in the Recruiting Provision or by the use of traditional prosecuto-rial tools of conspiracy and solicitation.
For the foregoing reasons, I respectfully dissent from Part IILC.ii of the Court’s opinion.
III. Part III.D — Issues not addressed in the majority opinion.
I join in the Court’s decision not to address Manzanares’ claims that the information failed to contain all necessary elements of the offense and the sufficiency of the evidence. I do so because I believe that the Recruiting Provision is facially unconstitutional and cannot be saved by a construction that would impose a specific intent requirement. Therefore, I join in the result reached by the majority.

. In this dissent, all citations to, and quotations from, the ICGEA refer to the statutes in effect at the time of Manzanares’ plea of guilty. The act was amended earlier this year. 2011 Idaho Sess. Laws ch. 188, 538-40.

. Idaho Code § 18-8502(2). defines a "criminal gang member” as:
... any person who engages in a pattern of criminal gang activity and who meets two (2) or more of the following criteria:
(a) Admits to gang membership;
(b) Is identified as a gang member;
(c) Resides in or frequents a particular gang's area and adopts its style of dress, its use of hand signs, or its tattoos, and associates with known gang members;
(d) Has been arrested more than once in the company of identified gang members for offenses that are consistent with usual gang activity;
(e) Is identified as a gang member by physical evidence such as photographs or other documentation; or
(f) Has been stopped in the company of known gang members four (4) or more times.

. Idaho Code § 18-8502(3) states:
"Pattern of criminal gang activity” means the commission, attempted commission or solicitation of two (2) or more of the following offenses, provided that the offenses are committed on separate occasions or by two (2) or more gang members:
ía) Robbery, as provided in section 18-6501, Idaho Code;
(b) Arson, as provided in sections 18-801 through 18-804, Idaho Code;
(c) Burglary, as provided in sections 18-1401, 18-1403, 18-1405 and 18-1406, Idaho Code;
(d) Murder or manslaughter, as provided, respectively, in sections 18-4001 and 18-4006, Idaho Code;
(e) Any violation of the provisions of chapter 27, title 37, Idaho Code, that involves possession with intent to deliver, distribution, delivery or manufacturing of a substance prohibited therein;
(f) Any unlawful use of a weapon that is a felony pursuant to chapter 33, title 18, Idaho Code;
(g) Assault and battery, as provided in chapter 9, title 18, Idaho Code;
(h) Criminal solicitation, as provided in section 18-2001, Idaho Code;
(i) Computer crime, as provided in section 18-2202, Idaho Code;
(j) Theft, as provided in sections 18-2401 and 18-2403, Idaho Code;
(k) Evidence falsified or concealed and witnesses intimidated or bribed, as provided in sections 18-2601 through 18-2606, Idaho Code;
(/) Forgery and counterfeiting, as provided in sections 18-3601 through 18-3603 and sections 18-3605 through 18-3616, Idaho Code;
(m) Gambling, as provided in section 18-3802, Idaho Code;
*430 (n) Kidnapping, as provided in sections 18-4501 through ¡8-4503, Idaho Code;
(o) Mayhem, as provided in section 18-5001, Idaho Code;
(p) Prostitution, as provided in sections 18-5601 through 18 — 5614, Idaho Code;
(q) Rape, as provided in sections 18-6101, 18-6108 and 18-6110, Idaho Code;
(r) Racketeering, as provided in section 18-7804, Idaho Code;
(s) Malicious harassment, as provided in section 18-7902, Idaho Code.
(t) Terrorism, as provided in section 18-8103, Idaho Code;
(u) Money laundering and illegal investment, as provided in section 18-8201, Idaho Code.

. All factual references to the composition of Rotary International and its objectives may be found at http://www.rotary.org/EN/ABOUTUS/ Pages/ridefault.aspx.

. As will be discussed more fully in this opinion, the United States Supreme Court has addressed this issue by imposing a requirement that the defendant possess the specific intent to advance criminal aims of the organization:
The problems in attributing criminal behavior to an abstract entity rather than to specified individuals, though perhaps difficult theoretically, as a practical matter resolve themselves into problems of proof. Whether it has been successfully shown that a particular group engages in forbidden advocacy must depend on the nature of the organization, the occasions on which such advocacy took place, the frequency of such occasions, and the position within the group of the persons engaging in the advocacy. Understood in this way, there is no great difference between a charge of being a member in a group which engages in criminal conduct and being a member of a large conspiracy, many of whose participants are unknown or not before the court. Whatever difficulties might be thought to inhere in ascribing a course of criminal conduct to an abstract entity are certainly cured, so far as any particular defendant is concerned, by the requirement of proof that he knew that the organization engages in criminal advocacy, and that it was his purpose of [sic] further that criminal advocacy.
Scales v. United States, 367 U.S. 203, 226 n. 18, 81 S.Ct. 1469, 1485 n. 18, 6 L.Ed.2d 782, 800 n. 18 (1961) (citation omitted, emphasis added).

. The United States Supreme Court has consistently held that the First Amendment is applicable to the states through the Due Process Clause of the Fourteenth Amendment. See, e.g., De Jonge v. State of Oregon, 299 U.S. 353, 364, 57 S.Ct. 255, 259-60, 81 L.Ed. 278, 283-84 (1937).
Justice Eismann correctly cites Justice Thomas’ concurrence in McDonald v. City of Chicago, Ill., - U.S. -, -, 130 S.Ct. 3020, 3059, 177 L.Ed.2d 894, 938-39 (2010), as authority for the proposition that the Privileges and Immunities Clause is the basis upon which the freedoms guaranteed by the Bill of Rights are protected from state action. However, a majority of the United States Supreme Court expressly declined to join in Justice Thomas' opinion on this subject. Justice Alito, joined by Chief Justice Roberts and Justices Scalia and Kennedy, discussed the Slaughter-House Cases, 83 U.S. 36, 16 Wall. 36, 21 L.Ed. 394 (1873), which held that the Privileges or Immunities Clause protects only those rights “which owe their existence to the Federal government, its National character, its Constitution, or its laws.” Id. at 79. The McDonald plurality refused to accept the Petitioners’ request that the decision of the Slaughter-House Cases be overturned, stating:
We see no need to reconsider that interpretation here. For many decades, the question of the rights protected by the Fourteenth Amendment against state infringement has been analyzed under the Due Process Clause of that Amendment and not under the Privileges or Immunities Clause. We therefore decline to disturb the Slaughter-House holding.
—■ U.S. at -, 130 S.Ct. at 3030-31, 177 L.Ed.2d at 907-08.
The plurality was joined by Justice Stevens in his dissent:
I agree with the plurality’s refusal to accept petitioners’ primary submission. Their briefs marshal an impressive amount of historical evidence for their argument that the Court interpreted the Privileges or Immunities Clause too narrowly in the Slaughter-House Cases, 16 Wall. 36, 21 L.Ed. 394 (1873). But the original meaning of the Clause is not as clear as they suggest — and not nearly as clear as it would need to be to dislodge 137 years of precedent.
Id. at-, 130 S.Ct. at 3089, 177 L.Ed.2d at 971 (citations and footnote omitted).

. Although political discourse is a common manifestation of expressive association, the expressive activity of a group entitled to First Amendment protections need not be politically oriented. Stanglin, 490 U.S. at 25, 109 S.Ct. 1591 (referencing the statement in Griswold v. Connecticut, 381 U.S. 479, 483, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510, 514 (1965), that "[t]he right to freely associate is not limited to ‘political’ assemblies, but includes those that 'pertain *435 to the social, legal, and economic benefit’ of our citizens.”). Because of the value of expressive association, even government infringements that merely chill expressive association must be finely tuned to achieve their objectives. Scales, 367 U.S. at 229, 81 S.Ct. at 1486, 6 L.Ed.2d at 801.

. I rely on case law from this era because it is the richest source of decisions from the United States Supreme Court relating to First Amendment rights of association and the power of the state and federal governments to interfere with those relationships. Further, I believe that the contemporary fear of the societal threat posed by gangs, and the legislative response thereto, mirror the perceived threat posed by the Communist Party and the corresponding legislative response during the Cold War era.

. Although Aptheker was decided on Fifth Amendment grounds, the United States Supreme Court subsequently noted that it also implicated the First Amendment right to freedom of association. United States v. Robel, 389 U.S. 258, 262-63, 88 S.Ct. 419, 422-23, 19 L.Ed.2d 508, 512-13 (1967).

. The State asserts that because I.C. § 18-8504 criminalizes recruitment rather than membership, it does not infringe upon the right to freedom of association. However, the United States Supreme Court has recognized "a prohibition of potential association with nonmembers” as an infringement under the First Amendment. Tashjian v. Republican Party of Conn., 479 U.S. 208, 215, 107 S.Ct. 544, 549, 93 L.Ed.2d 514, 524 (1986).